James A. Hennefer (SBN 059490)
Joseph Wood (SBN 103596)
HENNEFER, FINLEY & WOOD
425 California Street, 19th Floor
San Francisco, CA 94104-2296
Telephone: (415) 421-6100
Facsimile:   (415) 421-1815

Attorneys for Plaintiff
RICHARD B. FOX, M.D.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Richard B. Fox, M.D.; | ) **CASE NO.    08-CV-01098 RS** |
| Plaintiff, | ) |
| | ) **FIRST AMENDED COMPLAINT** |
| vs. | ) |
| | ) **Demand for Jury Trial** |
| William Piché, Paul N. Beaupre, M.D., Arthur | ) |
| W. Douville, M.D., Mark S. McConnell, | ) |
| M.D.,  and Kenneth I. Tan, M.D.; | ) |
| Defendants. | ) |
| _____ | ) |

1    **Table of Contents**

2    I.    Nature of this Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3    II.   Jurisdiction, Venue, and Interstate Commerce . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4    III.  The Parties and Other Relevant Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5          A.    Plaintiff Dr. Fox . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6          B.    Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7          C.    HCA and GSH Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8    IV.   Facts Common to All Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9          A.    Pediatric Intensive Care ("PIC") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10               1.    General Description of Pediatric Intensive Care . . . . . . . . . . . . . . . . 6

11               2.    PIC Relevant Antitrust Markets - Product and Geographic Market . . . . . . 7

12         B.    "Appropriate" Backup Coverage for Physicians . . . . . . . . . . . . . . . . . . . . . . . 8

13         C.    Actions of the Pediatric Executive Committee, Medical Staff
                 Executive Committee, Hospital Board of Trustees from 1996-2003 . . . . . . . . . . . 8

14
15         D.    Actions of the Pediatric Executive Committee, Medical Staff
                 Executive Committee, Board of Trustees from 2004-2008 . . . . . . . . . . . . . . . . 12

16               1.    Dr. Mendoza Withdraws Application . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17               2.    Change of the PICU Privileging Rules
                       Adopting the Intentionally Arbitrary and Capricious
18                     "Board Prepared" Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

19               3.    Arbitrary and Capricious Application of the
                       New PICU Privileging Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
20
21               4.    Termination of Dr. Fox's Medical Staff Appointment
                       For Refusing to Sign the HCA Loyalty Oath in 2006 . . . . . . . . . . . . . . . 14

22               5.    Arbitrary, Anticompetitive Use of the
                       PICU Coverage Rules for NorCal PICU . . . . . . . . . . . . . . . . . . . . . . . . 15
23
24               6.    Refusal to Notify Dr. Fox or Supply Him
                       with Reappointment Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

25         D.    Economic Analysis of the Actions of the Pediatric Executive
                 Committee, Medical Staff Executive Committee, Board of Trustees . . . . . . . . . . 17
26
     V.    Law Common to All Claims for Relief ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

27         A.    Health Care Quality Improvement Act (42 U.S.C. § 1101, et seq.) . . . . . . . . . . . 18
28

*Fox v. Piché, et al.*        **First Amended Complaint**        Case No.  08-CV-0198  RS

B.    Individual Liability of Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.    Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A.    First Claim for Relief
        (Against All Defendants)
        Unreasonable Restraint of Trade - Exceeding
          Self-Regulation Authority
        (Section 1 of the Sherman Act, 15 U.S.C. § 1) . . . . . . . . . . . . . . . . . . . . 19

B.    Second Claim for Relief
        (Against All Defendants)
        Unreasonable Restraint of Trade - Rule of Reason Group Boycott
        (Section 1 of the Sherman Act, 15 U.S.C. § 1) . . . . . . . . . . . . . . . . . . . . 20

C.    Third Claim for Relief
        (Against All Defendants)
        Unreasonable Restraint of Trade - *De Facto*
          Exclusive Dealing Contract
        (Section 1 of the Sherman Act, 15 U.S.C. § 1) . . . . . . . . . . . . . . . . . . . . 21

D.    Fourth Claim for Relief
        (Against All Defendants)
        Unreasonable Restraint of Trade – Retaliation
        (Section 1 of the Sherman Act, 15 U.S.C. § 1 and
          California Business & Professions Code § 2056) . . . . . . . . . . . . . . . . . 22

E.    Fifth Claim for Relief
        (Against All Defendants)
        Monopolization and Attempt to Monopolize
        (Section 2 of the Sherman Act, 15 U.S.C. § 2) . . . . . . . . . . . . . . . . . . . . 22

F.    Sixth Claim for Relief
        (Against All Defendants)
        Retaliation – Withholding of Hospital
          Privileges in Violation of Public Policy
        (Calif. Bus. & Prof. Code  § 2056) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

G.    Seventh Claim for Relief
        (Against Defendants Piché and Beaupre)
        Breach of Contract and of Implied Covenant of Good Faith and
          Fair Dealing
        (California Common Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

H.    Eighth Claim for Relief
        (Against All Defendants)
        Interference With Prospective Economic Relations
        (California Common Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI.   Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Demand for Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Fox v. Piché, et al.*          **First Amended Complaint**        Case No.  08-CV-0198  RS

1       COMES NOW plaintiff Richard B. Fox, M.D. ("Dr. Fox", or "plaintiff"), demands a

2   jury trial as to all issues triable by a jury and alleges the following.

3   ## I.    NATURE OF THIS ACTION

4       1.    This is an action by Dr. Fox, a well-credentialed, very highly skilled pediatric

5   intensive care ("PIC") and pediatric pulmonology physician who has an impeccable record.

6   Dr. Fox had full medical privileges at Good Samaritan Hospital ("GSH") until 1999 when the

7   actions denying him privileges began. These actions have continued unabated into 2008. Dr.

8   Fox has never been able to regain his full privileges.

9       2.    The action is brought against the CEO of GSH William Piché ("Piché") and Dr.

10   Paul Beaupre ("Dr. Beaupre"), GSH's COO; against the GSH Medical Staff Executive

11   Committee chairperson and member Dr. Arthur Douville ("Dr. Douville"); against the owner

12   of a competing PIC Services provider at GSH Dr. Mark McConnell ("Dr. McConnell"); and

13   against the GSH's Pediatric Executive Committee Member and a partner in a neonatal

14   intensive care services affiliate of Dr. McConnell's group, Dr. Kenneth Tan ("Dr. Tan").

15       3.    The action is brought because these individual defendants, from 2004 through

16   2008, repeatedly acted to suspend, withhold, defer and deny the "PIC Privileges" needed for

17   Dr. Fox to provide "PIC Services"[1] at GSH.  Dr. Fox's exclusion from providing PIC Services

18   at GSH has been based on arbitrary and sham pretexts, was for retaliatory and anticompetitive

19   purposes in the self interests of defendants and was for reasons having nothing to do with

20   legitimate considerations, such as Dr. Fox's qualifications, skill or quality of patient care.

21   Each of these defendants took an active role in these repeated illegal suspensions, withholding,

22   deferrals and denials of Dr. Fox's privileges in the period from 2004 through 2008.

23       4.    Defendants, under California law, were charged with the authority to privilege

24

25       [1] "PICU Privileges" for Dr. Fox include Pediatric Critical Care without consultation, Pediatric
26   Ventilator Management, and Pediatric Intensive Care – the package necessary for Dr. Fox to practice
both of his board-certified specialties, Pediatric Critical Care and Pediatric Pulmonology and to render
27   full "PICU Services." GSH changed the privilege categories and their requirements and they suspended,
withheld, deferred or denied various iterations of these privileges so that after 1998 Dr. Fox was never
28   able to regain the entire package of PICU Privileges necessary to render full PICU Services as before.

*Fox v. Piché, et al.*        **First Amended Complaint**        Case No.  08-CV-0198 RS

1  doctors and entrusted to exercise  independent judgment, through GSH's Medical Staff, for

2  privileging and the operation of GSH in the interest of patients and the community (22

3  California Admin. Code § 70701 et seq.).  Had they done so, they would have been immune

4  from liability under federal law. ( Health Care Quality Improvement Act ("HCQA"), 42 U.S.C.

5  § 11101 et seq.)  Instead, they abused their public trust and neglected their legal duties to PICU

6  patients, GSH doctors and the community. They did so in order to advance HCA's and their

7  own economic interests by excluding Dr. Fox from offering PICU Services at GSH.  They

8  thereby damaged competition, PICU patients and Dr. Fox, through unreasonable restraints of

9  trade and monopolization of PICU Services at GSH. (Sherman Act, Sections 1 and 2, 15

10 U.S.C. §§ 1 and 2, Claims I - V.)  Instead of basing their privileging on the best interests of

11 GSH and its patients and the qualifications of physicians, they retaliated against Dr. Fox for

12 advocating patient rights and HCA's compliance with the law, in violation of California law

13 (California Business & Professions Code § 2056, Claim VI), violated contractual agreements

14 with Dr. Fox (Claim VII), and interfered with Dr. Fox's PICU business relations (Claim VIII).

15     5.     HCA and the GSH Medical Staff organization are defendants in a previous and

16 related action filed in this court by Dr. Fox ("2004 Action").   GSH's for-profit owner, HCA,

17 and its affiliates took over the non-profit GSH in 1996.  HCA immediately involved GSH in a

18 nationwide Medicare fraud scheme (for which HCA pled guilty to a criminal indictment in

19 2002) and in other illegal acts, including those alleged in this complaint.  HCA secured the

20 cooperation of the individual defendants herein, through: (a) direct employment of them (Piché,

21 Beaupre); (b) appointment of them to GSH positions (Piché, Beaupre, Douville); and

22 (c) its contracts with them (McConnell, Tan).  With defendants' active participation, HCA was

23 able to violate or avoid legal requirements for "privileging" of Dr. Fox, retaliate against Dr.

24 Fox for patient advocacy, and exclude Dr. Fox from providing PICU Services at GSH.

**II.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

25

26     6.     This action arises under the laws of the United States and this court has

27 jurisdiction of the subject matter of this complaint under *28 U.S.C. § 1331*, federal question

28 jurisdiction. The court also has jurisdiction under *28 U.S.C. § 1337*, for regulation and

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

-2-

protection of commerce.  This court has supplemental jurisdiction under *28 U.S.C. § 1367* over the state law claims for relief since all clams derive from the same common nucleus of facts.

7.     Venue is proper in this court because defendants reside in this district and a substantial part of the acts and omissions giving rise to the claims occurred in this district.

8.     Dr. Fox is a physician who had offices in San Jose, California, and Los Gatos, California.  Dr. Fox provides medical services to patients in California.  He was and is involved in interstate commerce in that he receives patients and significant amounts in payment for his services from sources outside of the state of California.

9.     The GSH Pediatric Executive Committee, Medical Staff Executive Committee, and Board of Trustees through their members determine which physicians are credentialed to practice pediatrics at GSH in San Jose, California.  The physicians who are credentialed admit and treat patients and receive significant payments from sources outside of the state of California.  Credentialing activity and treatment also affect interstate commerce.

### III.     THE PARTIES AND OTHER RELEVANT PERSONS

**A.     Plaintiff Dr. Fox**

10.     Plaintiff Richard B. Fox, M.D. ("Dr. Fox" or "plaintiff") was at all relevant times, a board-certified or board eligible specialist in Pediatric Critical Care Medicine and also a board-certified specialist in Pediatric Pulmonology Medicine.

**B.     Individual Defendants**

11.     Defendant William Piché ("Piché") is employed by HCA as the CEO of GSH. He has been CEO since 1997.  He is not a physician.  However, he appoints the members of GSH's Board of Trustees ("BOT") and sits on the GSH BOT, which controls GSH physician privileges.  On behalf of HCA he has appointed defendant physicians to posts and/or awarded them contracts for services at GSH.

12.     Defendant Dr. Paul Beaupre ("Dr. Beaupre"), is the COO and Medical Director of GSH, appointed by and in the employment of HCA.  He is also a GSH BOT Member, appointed by HCA. He was GSH's Chief of Medical Staff from July 1997 - June 1998.

13.     Defendant Dr. Arthur Douville ("Dr. Douville") was at all relevant times on the

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198 RS

GSH Medical Staff Executive Committee.  He was Chief of GSH's Medical Staff from 1998 - 2001. He is under contract to HCA for emergency room services.  He was appointed by HCA to the quality review board of the GSH Medical Staff and as chair for GSH's continuing medical education.

14.    Defendant Dr. Kenneth Tan ("Dr. Tan") was the Vice-Chair of GSH's Department of Pediatrics from 2003-2005 and its Chair from 2006-2007. He is a partner in Pediatrix Medical Group, which had a contract with HCA for neonatal IC services at GSH and elsewhere.

15.    Defendant Dr. Mark S. McConnell ("McConnell") provided  PICU services for HCA at GSH and at the San Jose Medical Center (until HCA closed the Center).  Dr. McConnell founded Northern California PICU Associates ("NorCal PICU"), which was given an HCA contract in 1999 for 24/7 coverage of PICU patients at GSH.

**C.    HCA and GSH Entities**

16.    Non-profit hospitals, like GSH before 1996, were traditionally financed by a non-profit foundation and overseen through a board of trustees.  The board of trustees usually consisted of prominent citizens in the community.  *22 Cal. Admin. Code § 70701* requires that the board of trustees of a hospital shall have "written bylaws in accordance with legal requirements and its community responsibility."  GSH had such bylaws ("GSH Bylaws").

17.    The GSH Bylaws provided for the GSH Medical Staff – its doctors — to be the "self govern[ing]" entity required under *22 Cal. Admin. Code § 70701*, with responsibility for the quality of patient care, including staffing GSH with doctors "worthy in character and professional ethics" and who could "demonstrate their ability to perform surgical and/or other procedures competently." The GSH Medical Staff operated under its own set of bylaws ("Medical Staff By-Laws").  These included medical staff "privileging" procedures.

18.    The GSH Medical Staff has a Chief of Staff, elected for two years.  The Chief of Staff presides over the Medical Staff Executive Committee ("MSEC").  The MSEC makes final recommendations to the Board of Trustees as to all medical staff privileging rules and actions.  Defendants Beaupre and Douville were on the MSEC at all relevant times.

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

19.    The GSH Medical Staff is divided into Medical Staff Departments (surgery, obstetrics, neurology, etc.).  One Medical Staff department is the Department of Pediatrics.

20.    The executive body of GSH's Department of Pediatrics is the Pediatric Executive Committee ("PEC").  The GSH PEC makes initial recommendations to the MSEC on all medical staff privileging rules and actions involving members of the Department of Pediatrics, including privileges for Dr. Fox.  Defendant Tan was on the PEC at all times relevant to this complaint.  He was Vice-Chairman of the PEC from 2003-2005 and Chairman from 2005-2007.

21.    Northern California PICU Associates ("NorCal PICU") was founded by defendant Dr. McConnell and employed other PICU doctors at GSH, including Drs. William J. Silva and Margaret Smyklo. At its request, NorCal PICU was given 24/7 coverage for PICU at GSH and referral of all PICU patients at GSH.  This continued through 2004 as to Dr. McConnell.  Drs. Silva and Smyklo remained as PICU coverage at GSH to 2008.

22.    The Santa Clara County Independent Practice Association ("SCCIPA") is a physician group which contracts to provide services to managed-care health plans.  Some members of GSH's PEC were members of SCCIPA, including Dr. Tan.  Under many health plans, SCCIPA receives a fixed monthly payment for all physician services required for those patients.  If SCCIPA can find specialist physicians who will agree to accept lower payments, the money saved goes to the primary care physicians, like those on GSH's PEC.  Drs. Tan, McConnell, Silva and Smyklo accepted the discounted SCCIPA rates. These discounted rates were supplemented by GSH through the 24/7 NorCal PICU contract with HCA. Dr. Fox did not participate in SCCIPA nor accept its discounted rates.

23.    Pediatrix Medical Group, Inc. ("Pediatrix") was run by former HCA executives and provided physicians for neonatal ICU services ("NNIC Services").  Dr. Tan and his partner, through Pediatrix, were also willing to take the discounted SCCIPA rates for NNICU services and were also under contract with HCA to provide NNIC Services 24/7 at GSH.

24.    HCA, Inc., a/k/a "Columbia/HCA" and "HCA/Hospital Corporation of America" (jointly "HCA") is a holding company with numerous affilliates, including GSH,

operating as Good Samaritan Hospital LP.  HCA owns 100% of Samaritan Hospital, LLC, and, through that, 100% of Good Samaritan Hospital LP.  HCA, through its officers and employees, participated in the unlawful acts alleged in the 2004 Action and in this action.

25.     Good Samaritan Hospital LP and its general partner(s) Samaritan LLC and/or Good Samaritan Hospital LLC (jointly "GSH") are for-profit organizations which provide health care services in a variety of areas of medical treatment, including pediatrics, to individuals who reside in San Jose, California, and the area immediately surrounding San Jose. GSH has been managed since 1997 by its CEO, Piché.  Piché reports to Mr. Thomas May ('May'), President of HCA's Far West Division in Las Vegas, Nevada.  May was Piché's predecessor as CEO of GSH and of San Jose Medical Center, which is also owned by HCA. Through its officers and employees, including Piché, GSH participated in the unlawful acts alleged in the 2004 Action and in this action.

26.     Bingham McCutchen LLP, and its predecessor, McCutchen Doyle, Brown and Enerson, have represented HCA, its affiliates, GSH, the GSH Medical Staff and their officers since approximately 1996.  They have advised HCA, GSH, the GSH Medical Staff and individual defendants herein regarding the unlawful acts alleged in this action, as well as in previous state court litigation regarding Dr. Fox's privileges and in the 2004 Action.  Ross Campbell has been the lead attorney for Bingham.

## IV.    FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.    Pediatric Intensive Care ("PIC")**

**1.    General Description of Pediatric Intensive Care**

27.     PIC is provided in a pediatric intensive care unit ("PICU"), a specialized unit within a hospital. A PICU has the most highly skilled doctors and nurses and advanced life support technology. These are deployed to treat children with life-threatening conditions.  PIC requires a team of physicians and nurses including pediatric medical subspecialists, surgical subspecialists, anesthesiologists, ICU nurses, and respiratory therapists in the same location.

28.     The PIC specialist, or "pediatric intensivist", is a specialty developed not around an organ system (e.g. heart or lungs or brain) but to coordinate and triage patient care in the

*Fox v. Piché, et al.*         **First Amended Complaint**        Case No.  08-CV-0198  RS

PICU. The functions of the pediatric intensivist can be assumed by another PICU specialist on the team, since all work closely together and understand each others' roles.

### 2.    PIC Relevant Antitrust Markets - Product and Geographic Market

29.    PICU services represent a separate product market from other medical services. There is no substitutability of demand and no cross-elasticity of demand or price for PICU services with other medical services.  Children in need of  PICU services cannot substitute other medical  services (dermatology, podiatry, etc.) for PICU services.  Their pediatric physicians and parents do not price shop PICU services nor switch PICU providers based on price.  Other physicians rarely switch to providing PICU services from other fields.

30.    GSH, with its unique PICU program, is a separate geographic market.  Both sellers (GSH) and buyers (parents, pediatric physicians and nurses recommending PICU services) treat it so.  Most children who consume PICU services were born at GSH or were already under the care of Dr. Fox or other GSH pediatric specialists. They constitute an economic "aftermarket" from which they can exit only at significant switching cost, both personal and financial.  Other providers of PICU services in the greater Santa Clara County area are not reasonable substitutes for patients in need of PICU services offered at GSH. Kaiser requires enrollment in its HMO. Valley Medical Center lacks a full complement of pediatric specialists.  Packard Children's Hospital is too distant and limits its patients. Children in need of PICU services, whether a pediatric physician chooses GSH for an acutely sick child or one comes into the GSH emergency room, cannot practically, or even legally (under the EMTALA statute) be transferred to other hospitals which may offer PICU services, and they rarely do so.

31.    Defendants and those who participated in the illegal acts alleged herein have the power to control prices and to exclude competition in this PICU relevant market. Because PICU care is a critical need, it is relatively price insensitive.  The barriers for competitors to enter the PICU services market at GSH are high.  These barriers to entry include, but are not limited to: (a) obtaining the necessary pediatric subspecialty certification; (b) obtaining and maintaining privileges from the GSH Medical Staff under its privileges rules; (c) residing in

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

1  sufficient proximity to GSH to offer emergency services; (d) developing a referral base with

2  pediatric doctors who admit patients to GSH and with the pediatric nurses at GSH; and,

3  (e) being willing to associate with an HCA hospital, given its poor reputation.

4      32.    The prices obtained at GSH for PICU services have been supra-competitive,

5  given the quality of such services.  These supra-competitive prices have not caused appreciable

6  numbers of patients to switch to competitive sellers of these services from 1999 through the

7  present.  The supra-competitive prices have not caused new entry or the switching of resources

8  of competitors into PICU services at GSH.

9  **B.    "Appropriate" Back Up Coverage for Physicians**

10     33.    All members of the GSH Medical Staff are required to provide the names of

11  alternate physicians who can provide emergency care of their patients in the event that the

12  physician is unable to do so.  The requirement at GSH is that members of the medical staff

13  must provide the names and telephone numbers of two other members of the medical staff who

14  have "appropriate" medical staff privileges. "Appropriate" at GSH has, except for Dr. Fox,

15  meant the ability to assume overall care of the patient in question. As set out at paragraph 28,

16  any member of the team of PICU specialists can assume overall care of a PICU patient.  This

17  had meant, until 1999 that Drs. McCracken and Dahlstrom as members of the PICU specialist

18  team were "appropriate' coverage, with pediatric gastroenterology specialties.

19
20  **C.    Actions of the Pediatric Executive Committee, Medical Staff Executive Committee, Hospital Board of Trustees from 1996-2003**

21     34.    As alleged in the 2004 Action, GSH and its parent, HCA, have a long history of

22  unlawful business practices and of obtaining the cooperation of physicians in these unlawful

23  practices, in part by offering them kickbacks and other considerations.

24     35.    When HCA took over GSH 1996, it added GSH to its nationwide scheme of:

25  (a) paying illegal kickbacks to cooperating physicians, and (b) fraudulent billing of Medicare,

26  Medicaid, and similar U.S. Government programs, including fraudulent billings by GSH.  HCA

27  pleaded guilty to multiple criminal acts, including unlawful kickbacks to physicians, and

28  agreed to pay over $1.7 billion in fines and penalties to the U.S. government by 2002.

*Fox v. Piché, et al.*        **First Amended Complaint**        Case No.  08-CV-0198  RS

36    Through HCA, GSH fraudulently billed the U.S. Government over $760,000 in 1996 and 1997.  This never became public in San Jose.  Following FBI raids on HCA and confiscation of its accounting records in March 1997, HCA announced in San Jose that GSH had just discovered financial losses at GSH, allegedly caused by computer glitches, and HCA sought to recoup these losses.  HCA announced its plan to corner the South Bay PICU and NNICU market by controlling its PIC and NNIC physicians and those of Packard Children's Hospital through a joint venture with Packard.  Dr. Fox openly opposed this.

37.    Dr. Fox's reputation was beyond reproach, personally and professionally.  Dr. Fox's from 1992 on had made complaints to GSH on behalf of nurses and other doctors about patient care problems. In two incidents in which Dr. Fox reported violations of patients' rights to the State of California, in 1996 and 1999, GSH was cited by the State for violations.  Dr. Fox was told by another doctor to "watch your back" after a hearing on one of his complaints.  GSH (and HCA after it took over the Hospital in 1996) expressed extreme displeasure at Dr. Fox engaging in such "whistle-blowing."

38.    Dr. Fox did not fit in with HCA's way of doing business -- profits above patients and even profits above the law.  He wanted no part of it.  He stood in the way of HCA's plans to increase its profits, even illegally, on children's ICU services.

39.    However, HCA had other doctors who would cooperate.  One of these was defendant Dr. McConnell, a competitor of Dr. Fox who ran a PICU at another HCA hospital, the San Jose Medical Center.  Dr. McConnell and his associates were subsidized by HCA's illegal profits. Dr. Fox never asked for, nor accepted any subsidy from HCA, not wanting entanglement with HCA.

40.    In December 1996 Dr. McConnell wrote a letter to HCA's local CEO, Thomas May ("May"), offering to cooperate with HCA and asking May to close down Dr. Fox's competing PICU program at GSH so that he could take over all those patients for his own PICU program at HCA's San Jose Medical Center.

41.    HCA employed four means to divert Dr. Fox's PICU patients to Dr. McConnell's group. These included: (a) transferring pediatric emergency room patients at GSH

*Fox v. Piché, et al.*    **First Amended Complaint**    Case No.  08-CV-0198  RS

to Dr. McConnell's group at San Jose Medical Center (against the federal EMTALA law); (b) giving Dr. McConnell's group a *de facto* exclusive PICU contract at GSH; (c) forcing Dr. Fox to obtain his PICU alternate call coverage exclusively from Dr. McConnell by applying alternate coverage rules that Dr. Fox could only meet by joining with the McConnell group; and, (d) denying Dr. Fox medical privileges at GSH.

42.    The move to change the alternate coverage rules for Dr. Fox's PICU privileges started in early 1997, right after Dr. McConnell's letter to Mr. May in December 1996. GSH's then Chief of Staff, Dr. Beaupre, claimed, *ex post facto*, that the changes were needed to improve patient care because there had been complaints by nurses about Dr. Fox's alternate coverage. But Dr. Beaupre could not recall who those nurses were, nor was there anything in writing about those complaints. In fact, there were no such actual complaints and these complaints by unnamed PICU nurses were merely a pretext to try to justify the imposition of exclusionary rules targeting Dr. Fox. There was no investigation and no findings by the GSH Medical Staff showing complaints or alternate coverage problems for Dr. Fox.

43.    Claims of improving patient care by improving alternate coverage in the ICU were pretextual and sham. Dr. Fox's chief accuser, Chief of Staff Dr. Douville, was himself named by the ICU nursing manager as one of the worst coverage offenders for repeatedly failing to cover his calls from the ICU but suffered no privileging actions. The NorCal PICU/McConnell group doctors also had multiple alternate call coverage incidents without privileging actions. Doctors with serious drug and alcohol problems did not have their privileges restricted, but the privileges of Dr. Fox were.

44.    The actual appropriation of Dr. Fox's medical practice at GSH by targeting Dr. Fox's privileges involved a series of intricate procedural actions by the Pediatric Executive Committee ("PEC"), the Medical Staff Executive Committee ("MSEC"), and GSH's Board of Trustees ("BOT") beginning in 1997 and continuing into 2008.

45.    The PEC Members, the MSEC Members, and the BOT Members, including defendants, participated in the actions taken from 2004 through 2008. These actions, including administrative suspension, withholding, and deferring of requested PICU privileges, were not

*Fox v. Piché, et al.*        **First Amended Complaint**        Case No. 08-CV-0198 RS

authorized or permitted under the GSH Medical Staff Bylaws. They conflicted with the "appropriate" coverage standard at GSH.  They effected an unlawful *de facto* exclusive contract in favor of the NorCal PICU group.  They included the following: (a) instituting, in the fall of 1997, a more stringent policy at GSH regarding PICU privileges aimed at Dr. Fox by making his long-accepted and highly qualified "appropriate" alternate coverage physicians, Drs. McCracken and Dahlstrom, suddenly "inappropriate" coverage; (b)  administratively "withholding" Dr. Fox's privileges at GSH in March 1998 because of "inappropriate" coverage, rendering an administrative hearing and due process on the matter unavailable;  (c) creating three new privileges at GSH in April 1999, applicable only to the Department of Pediatrics, that would have forced Dr. Fox to designate Dr. McConnell's competing HCA sponsored and subsidized group, with less competent physicians, for Dr. Fox's back-up coverage;  (d)  administratively "suspending" Dr. Fox's privileges in June 1999 for failure to designate the competing McConnell group in place of Drs. McCracken and Dahlstrom; (e) delaying for more than a year, from 2002 to 2003,  acting on the PICU privilege applications of Dr. Fox's alternates, Drs. McCracken and Dahlstrom, and approving them only after Dr. Fox filed a mandamus action in state court; (f)  then, after being forced to approve Drs. McCracken and Dahlstrom in 2003, changing the rules again in 2004 to exclude them, and thereby to exclude Dr. Fox, by requiring applicants to be either "board certified or board prepared" in pediatric critical care medicine in order to qualify for PICU privileges; (g)  threatening to deny Dr. Fox his biennial medical staff reappointment altogether in February 2006 if Dr. Fox did not sign a "non-negotiable" "HCA Corporate form" "Confidentiality and Security Agreement" that pledged loyalty to "the best interests of the company [HCA] . . . at all times," in conflict with Dr. Fox's duty of loyalty to his patients as required under California law and the Hippocratic oath; and, (h)finally, in June 2006, simply terminating Dr. Fox's medical staff privileges entirely by refusing to send him his biennial reappointment letter.

/ / / / /

/ / / / /

/ / / / /

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198 RS

**D.    Actions of the Pediatric Executive Committee, Medical Staff Executive Committee, Hospital Board of Trustees from 2004-2008**

**1.    Dr. Mendoza Withdraws Application**

46.    On March 9, 2004, right after Dr. Fox filed his original action ("2004 Action") in this Court the PEC members once again "deferred" Dr. Fox's request for the Pediatric Ventilator Management ("PVM") privilege.  This deferral was approved by the MSEC members on April 9, 2004, and the BOT members at their April 2004 meeting.  Dr. Fox was notified of this deferral by letter of May 17, 2004 from  GSH's CEO Piché.   "Deferral" of a requested privilege is not authorized under GSH's Medical Staff Bylaws.  The "deferral" evades these Bylaws' requirement for hearing and appeal of the denial of a requested privilege.

47.    Dr. Fox's PVM privilege had been denied because one of Dr. Fox's proposed coverage physicians for that privilege, Dr. Mendoza, had been intimidated into withdrawing his own application for that privilege. This was initially kept from Dr. Fox.  Dr. Mendoza was reminded in writing on February 20, 2004 that he had been told by the GSH PEC chairman to withdraw his pediatric ventilator management privilege application.

48.    On March 4, 2004, Dr. Fox filed the 2004 Action in this court alleging that he believed Dr. Mendoza was being pressured to withdraw his privilege application.  The very next day, on March 5, 2004, Dr. Mendoza "withdrew" his application without notice to Dr. Fox.  This "Mendoza withdrawal" finally was submitted to the state court and provided the basis, on October 20, 2004, for the granting of GSH's demurrer in the mandamus action filed by Dr. Fox.

49.    But for this "withdrawal" of Dr. Mendoza's pediatric ventilator management privilege application, Dr. Fox's ability to provide PIC Services at GSH would have been restored, since he had forced the restoration of his Pediatric Critical Care admitting privilege in 2003 by filing a state court mandamus action.

**2.    Change of the PICU Privileging Rules Adopting the Intentionally Arbitrary and Capricious "Board Prepared" Requirement**

50.     To deal with Dr. Fox's near success in 2004 in overcoming his exclusion under the rules adopted in 1999, the GSH PEC members, acting under the close supervision of

*Fox v. Piché, et al.*                **First Amended Complaint**           Case No.  08-CV-0198  RS

-12-

hospital/medical staff counsel, and at the request of the NorCal PICU group, made yet another change in the rules for PICU privileges at its meeting of May 21, 2004.  No new clinical circumstances led to this change.  The new rule required that applicants for the PICU privilege must be either "board certified or board prepared" in Pediatric Critical Care Medicine.

51.    While the American Board of Pediatrics has established criteria for board certification in Pediatric Critical Care Medicine, there is no recognized category of "board prepared" and it has no known or accepted definition.  Defendants did not provide a definition in the rule they passed.  The rule was designed and intended to be used and was applied in a subjective, arbitrary, and capricious manner for anticompetitive purposes – to be used as a sword or shield as the need arose. This was a sham category created by defendants, with assistance of hospital/medical staff counsel, to give them a means of excluding Dr. Fox and his alternate coverage physicians, while allowing them to include their own contracted PICU doctors, even those who were not board certified.  This new rule was  approved by the MSEC members on June 11, 2004, and by the BOT members on June 23, 2004.

### 3.    Arbitrary and Capricious Application of the New PICU Privileging Rule

52.    This new rule, with its arbitrary and undefined "board prepared" requirement, was in fact applied disparately by defendants.  At the recommendation of the PEC members, the MSEC members, and the BOT members, Dr. McCracken's application for pediatric ICU privileges was denied on April 8, 2005 because she was not "board certified" in pediatric critical care medicine.  But Dr. Smyklo, a member of Dr. McConnell's NorCal PICU group and who was not board certified in pediatric critical care medicine because she couldn't pass the board examination, had her privileges approved by the same committees on September 30, 2005, presumably because, despite failing the board exam, she was "board prepared."

53    Later, in 2006 after Dr. McConnell left NorCal PICU to practice in Idaho, Dr. Silva had no one who was board certified for his alternate call, only the debatably "board prepared" Dr. Smyklo.  This problem was solved by specifying Dr. Tan, a neonatologist, neither board certified nor board prepared in PICU, as the other alternate. There was no difficulty getting this approved by the Pediatric Executive Committee (PEC) since Dr. Tan was

*Fox v. Piché, et al.*        **First Amended Complaint**        Case No.  08-CV-0198  RS

1   the Chairman.  There was no difficulty getting this approved at the Medical Staff Executive

2   Committee (MSEC) since Dr. Tan sat on that committee too.  Neither was there a difficulty

3   with approval of this by the Board of Trustees (BOT) since Dr. Tan's partner sat on that board.

4       54.    On February 21, 2006, Dr. Fox again applied for his biennial reappointment to

5   the medical staff at GSH.  He listed the Hospital's own contracted PICU coverage group, Drs.

6   Silva and Smyklo, as his pediatric ICU alternate call coverage.  This application was

7   considered, in turn by the PEC members, the MSEC members, and the BOT members.

8   According to a letter Dr. Fox received from GSH CEO William Piché on May 4, 2006, these

9   committees denied his application for this privilege because, ostensibly, he still had not

10  provided "appropriate" alternate call coverage.

11  **4.    Termination of Dr. Fox's Medical Staff Appointment
          For Refusing to Sign the HCA Loyalty Oath in 2006**

12      55.    As part of Dr. Fox's 2006 reappointment application, Dr. Fox was required to

13  sign a Confidentiality and Security Agreement, that was an HCA corporate requirement.   The

14  Agreement contained a loyalty oath requiring Dr. Fox to agree that, "I will act in the best

15  interest of the Company and in accordance with its Code of Conduct at all times during my

16  relationship with the Company."  By letter to GSH's Chief of Staff Dr. Fox declined to sign

17  this agreement because it conflicted with his obligations to put the interests of his patients

18  ahead of those of the hospital.   Dr. Fox was informed by GSH's Director of Medical Staff

19  Services, that his refusal to sign this agreement constituted a voluntary resignation.  Dr. Fox

20  still declined to sign.  When Dr. Fox's reappointment came before GSH's BOT on April 26,

21  2006, GSH's CEO Piché stated the annual signing of the agreement was an HCA policy and

22  required if physicians wanted to practice at GSH.

23      56.    On May 4, 2006, Mr. Piché sent Dr. Fox a letter in which he stated that Dr.

24  Fox's hospital privileges would terminate on June 30, 2006, unless the hospital decided to

25  change its policy on the Confidentiality Agreement.  All of Dr. Fox's medical staff privileges,

26  including his general pediatric and pediatric pulmonology privileges, expired on June 30, 2006.

27  Neither Mr. Piché nor anyone else so authorized at GSH sent Dr. Fox the customary and

28

*Fox v. Piché, et al.*         **First Amended Complaint**        Case No.  08-CV-0198 RS

-14-

1    standard reappointment letter prior to or after June 30, 3006.

2        57.    In his declaration in the 2004 Action signed September 18, 2006, Dr. Fox put

3    the parties and their counsel on notice that his medical staff privileges had been terminated as

4    of June 30, 2006, by the Piché letter of May 4, 2006, and that this termination had interfered

5    with Dr. Fox's ability to provide services for Drs. McCracken, Dahlstrom, and Abi-Hanna.

6    There was no response from GSH.

7        **5.    Arbitrary, Anticompetitive Use of PICU Coverage Rules for NorCal PICU**

8        58.    While defendants strictly enforced the PICU alternate coverage rules as to Dr.

9    Fox and his alternates, they did not enforce them as to GSH's contracted group, NorCal PICU.

10   After the San Jose Medical Center closed in late 2004, Dr. McConnell went to Idaho. Thus,

11   Drs. Silva and Smyklo, who remained at GSH, each had only one alternate instead of the two

12   required by the rule applied to Dr. Fox.   Drs. Silva and Smyklo were also using another

13   general pediatrician, not  PICU certified, to cover PICU patients.

14       59.    Thus, of the hospital's three PICU doctors in 2006, only one of them, Dr. Silva,

15   was board certified.  CEO Piché nonetheless assured the medical staff that they could continue

16   to refer PICU patients to Drs. Silva and Smyklo.  This group was even promoted in the GSH

17   Medical Staff's publication, the *Bulletin*.

18       60.    Subsequently HCA and GSH added three more board certified PICU specialists

19   to this group, Drs. Swift, Gheen, and Kesavulu.  However, they appear to be sham coverage

20   since none of them lives in Northern California and none qualifies as a practical matter to

21   provide alternate coverage at GSH.  They are all with the Children's Healthcare Network,

22   headquartered in Las Vegas, Nevada, at HCA's Sunrise Children's Hospital.

23       61.    Dr. Swift is CEO of the Children's Healthcare Network.  For his California

24   license, Dr. Swift lists an office address in Santa Barbara County.  For his Nevada license he

25   lists the address of the Children's Healthcare Network in Las Vegas.  The Children's

26   Healthcare Network website indicates that, in addition to his PICU activities at GSH in San

27   Jose, Dr. Swift directs the pediatric ICU at Sunrise Hospital in Las Vegas, co-directs pediatric

28   ICU's at three other California hospitals, including Encino-Tarzana Regional Medical Center,

*Fox v. Piché, et al.*        **First Amended Complaint**        Case No.  08-CV-0198  RS

Cottage Children's Hospital in Santa Barbara, and Riverside County Regional Medical Center

in Riverside, as well as the pediatric ICU's at the Washoe Medical Center in Reno, Nevada,

and at the Community Hospital of Missoula, Montana, and that he is also on staff at the Sierra

Vista Regional Medical Center in San Luis Obispo, California.   Dr. Gheen lists his address on

his California medical license as being in Las Vegas, Nevada, and holds a Nevada medical

license, too.  Dr. Kesavulu lists a Sherman Oaks, California address for both his California and

Nevada licenses.

**6.       Refusal to Notify Dr. Fox or Supply Him With Reappointment Letters**

62.      Dr. Fox had received no reappointment letter from GSH by June 2006, when

his medical staff appointment ran out.  No reappointment letter was forthcoming until

September 4, 2007, when Dr. Fox received a reappointment application for 2008 from GSH's

Chief of Staff Dr. Stephen Jackson.  On September 20, 2007, Dr. Fox responded to Dr.

Jackson, saying that he understood that his appointment at GSH had, according to the Piché

letter of May 2006, terminated  on June 30, 2006.

63.      Dr. Jackson never responded to Dr. Fox's letter.   Dr. Fox did receive a letter

from Carol Ostermann, Director of Medical Staff Services at GSH, on October 9, 2007.  Ms.

Ostermann claimed that Dr. Fox had actually been reappointed by GSH's Board of Trustees on

June 28, 2006, but that he had never been notified of this because of an "oversight."  She then

stated that Dr. Fox's next reappointment application was due "now."

64.      Since neither Dr. Jackson nor anyone else in authority had responded to Dr.

Fox's letter about the status of his 2006 reappointment, Dr. Fox's counsel wrote to

hospital/medical staff counsel on November 2, 2007, to clarify and to remind them that the

non-appointment issue had been raised to the parties and their counsel in Dr. Fox's Declaration

of September 18, 2006, in the 2004 Action, over a year before.

65.      Responding to Dr. Fox's counsel's November 2 letter, HCA and GSH counsel

confirmed that: (a) Dr. Fox did not receive a "standard" reappointment letter and, by

implication, would not be receiving one.  Hospital/medical staff counsel also stated that Dr.

Fox's pediatric ICU privileges would continue to be denied until such time as Dr. Fox directly

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

obtained the signatures of two members of the GSH's PICU as alternate coverage, even though that group was contractually required to provide that coverage to any and all members of the medical staff.

66.    On January 10, 2008, Dr. Jackson again wrote to Dr. Fox to notify him that his reappointment application was overdue and thus subject to a $500 late fee.  Dr. Jackson still did not respond to Dr. Fox's earlier letter regarding the Dr. Fox's 2006 reappointment.  On January 12, 2008, Dr. Fox replied to Dr. Jackson that the "oversight" of failing to send the previous reappointment letter  had still not been corrected.

67.    On January 25, 2008, GSH's CEO Piché responded to Dr. Fox's letter of January 12 to Dr. Jackson.  He stated that he wished to inform Dr. Fox that GSH's Board of Trustees had reappointed Dr. Fox to the medical staff at its meeting of June 28, 2006.  He further stated that Dr. Fox's request for pediatric ICU privileges had again been, "deferred pending your provision of appropriate alternate call coverage."

**E.    Economic Analysis of the Actions of the Pediatric Executive Committee, Medical Staff Executive Committee, Board of Trustees**

68.    The foregoing actions of defendants, individually and by and through HCA, GSH, and GSH's PEC, MSEC and BOT, have damaged competition in the relevant market for PICU Services and harmed consumers by unreasonably restraining trade and foreclosing Dr. Fox and other competitors and preventing or restricting their access to this relevant market.

69.    These actions are not justified by plausible arguments that they were intended to increase output, enhance the efficiency of, lower prices of or make more competitive the relevant market for PICU services or other market.  Such arguments were wholly pretextual.

70.    These actions were not the least restrictive alternative to accomplish procompetitive effect, if any that defendants sought to accomplish or which may have existed. These actions in fact injure competition and consumers, decrease output, raise prices and decrease economic efficiency in the said relevant market.  The likelihood of anticompetitive effects from such actions is clear and the possibility of procompetitive effects is remote.

71.    The purpose, intent and effect of these actions were unreasonably to restrain

*Fox v. Piché, et al.*            **First Amended Complaint**        Case No.  08-CV-0198  RS

trade and competition, to decrease competition, and to raise prices in the said relevant market for PICU services.

## V.    LAW COMMON TO ALL CLAIMS FOR RELIEF

**A.    Health Care Quality Improvement Act (42 U.S.C. § 11101 et seq.)**

72.    Because a hospital medical staff's privileging actions to exclude totally a qualified physician would otherwise violate federal and state laws, the Health Care Quality Improvement Act (HCQIA), *42 U.S.C. § 11111, 11112(a)* provides a safe harbor for such actions, but only if all of the standards in *42 U.S.C. § 11112(a)* are met.  These include: (1) the reasonable belief that the action was in the furtherance of quality health care; (2) a reasonable effort to obtain the facts of the matter; (3) adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and (4) acting in the reasonable belief that the action was warranted by the facts known.  None of these requirements was met in any of the privileging actions taken against Dr. Fox during the period 2004-2008.

73.    Because defendants failed to meet the requirements of the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11112(a) they are not immune from federal or state liability under its safe harbor provisions.

**B.    Individual Liability of Defendants**

74.    Each of the defendants, in committing the illegal actions alleged herein acted in his own economic and other self-interests, not within the scope of his duties as an agent, employee or manager of HCA, GSH or other GSH entity and is individually liable for his acts.

75.    GSH Pediatric and Medical Staff Executive Committee members were and are officers and directors of GSH's Medical Staff organization.  They had a statutory obligation to follow the Medical Staff Bylaws and to perform their duties in good faith, in the best interests of patient care and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.  They acted intentionally and maliciously or were grossly negligent in failing to meet this standard. They are individually liable for the damages that flow from their intentional or grossly negligent actions.

*Fox v. Piché, et al.*              **First Amended Complaint**         Case No.  08-CV-0198  RS

1    76.    GSH Board of Trustee members are directors of GSH.  They had a statutory

2  obligation to follow the GSH Bylaws and to  perform their duties in good faith, in a manner

3  that is in the best interests of patients and with such care, including reasonable inquiry, as an

4  ordinarily prudent person in a like position would use under similar circumstances.  They acted

5  intentionally and maliciously or were grossly negligent in failing to meet this standard and are

6  individually liable for the damages that flow from their intentional or grossly negligent actions.

7              **VI.   CLAIMS FOR RELIEF**

8                 **A.    First Claim for Relief**

9                    **(Against All Defendants)**
        **Unreasonable Restraint of Trade - Exceeding Self-Regulation Authority**
10          **(Section 1 of the Sherman Act, *15 U.S.C. § 1*)**

11    77.    Dr. Fox incorporates herein by reference paragraphs 1 to 76.

12    78.    GSH PEC members, including Dr. Tan, GSH MSEC members, including Dr.

13  Douville, and GSH BOT members including Piche and Dr. Beaupre, during the period from

14  2004 to the present, contracted, combined, and conspired with one another and with others,

15  including but not limited to GSH; its officers, including Piché and Dr. Beaupre; its corporate

16  parent, HCA, Inc.; its legal counsel; and Dr. McConnell; to deny Dr. Fox procedural safeguards

17  and fair procedure required under GSH's Medical Staff Bylaws and the Health Care Quality

18  Improvement Act, *42 U.S.C. § 11101 et seq*.  The failure to substantially comply with the

19  requirements of the Health Care Quality Improvement Act, *42 U.S.C. § 11101 et seq.* precludes

20  defendants from claiming any procompetitive justification for their exclusion of Dr. Fox from

21  practicing pediatric critical care at GSH.

22    79.    Defendants thus exceeded their authority to engage in self-regulation under that

23  Act and engaged in unreasonable restrains of trade in violation of Section 1 of the Sherman

24  Act, *15 U.S.C. § 1*.

25    80.    By reason of defendants' said unlawful actions and as a direct and proximate

26  result of such actions Dr. Fox has been injured in his businesses and property. As a result, the

27  public has been deprived of free and open competition for PICU services at GSH and Dr. Fox

28  has suffered, and will continue to suffer, extensive damages cognizable under the Sherman Act.

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

81.    Dr. Fox and the public have suffered and will continue to suffer irreparable harm through defendants' aforesaid unlawful actions in violation of Section 1 of the Sherman Act.   Dr. Fox and the public have no adequate remedy at law for this irreparable harm.

**B.  Second Claim for Relief**

**(Against All Defendants)**
**Unreasonable Restraint of Trade - Rule of Reason Group Boycott**
**(Section 1 of the Sherman Act, *15 U.S.C. § 1*)**

82.    Dr. Fox incorporates herein by reference paragraphs 1 to 81.

83.    In December 1996, Dr. McConnell requested that HCA close down Dr. Fox's competing PICU program at GSH, not for any quality of care issue, but because it was bad for his business and therefore bad for HCA. In 1997 HCA and GSH began action to change the PICU privileging rules applied to Dr. Fox. In 1999 HCA signed a contract for 24/7 PICU coverage with NorCal PICU Associates.

84.    The actions set forth above between 1997 through 2007 to suspend, withhold, and defer Dr. Fox's PICU privileges and prevent GSH physicians from doing business with Dr. Fox each constitute an illegal group boycott of Dr. Fox from providing PICU Services at GSH.

85.    In 1999, 2000, 2002, 2003, 2004, and 2006, defendants conspired to repeatedly "withhold" and "defer" and deny Dr. Fox's requests for reinstatement of his PICU privileges despite Dr. Fox's efforts to comply with the new coverage requirements.

86.    GSH PEC members, including Dr. Tan, GSH MSEC members, including Dr. Douville, and GSH BOT members, during the period from 2004 to the present, contracted, combined and conspired with one another and with others, including but not limited to GSH; its officers, including CEO Piché and Dr. Paul Beaupre; its corporate parent, HCA, Inc.; its hospital/medical staff counsel; and Drs. McConnell, Smyklo, and Silva; to illegally boycott Dr. Fox from obtaining and retaining PICU Privileges at GSH, thereby unreasonably restraining trade in violation of Section 1 of the Sherman Act, *15 U.S.C. § 1*.

87.    By reason of defendants' said unlawful actions and as a direct and proximate result of such actions Dr. Fox has been injured in his businesses and property. As a result, the public has been deprived of free and open competition for PICU services at GSH and Dr. Fox

1    has suffered, and will continue to suffer, extensive damages cognizable under the Sherman Act.

2        88.        Dr. Fox and the public have suffered and will continue to suffer irreparable

3    harm through defendants' aforesaid unlawful actions in violation of Section 1 of the Sherman

4    Act.   Dr. Fox and the public have no adequate remedy at law for this irreparable harm.

5                                   **C.  Third Claim for Relief**

6                                      **(Against All Defendants)**
     **Unreasonable Restraint of Trade - *De Facto* Exclusive Dealing Contract**
7                         **(Section 1 of the Sherman Act, *15 U.S.C. § 1*)**

8        89.        Dr. Fox incorporates herein by reference Paragraphs 1 to 88.

9        90.        The PEC members, MSEC members, and BOT members made the NorCal

10   PICU group a *de facto* exclusive "gate keeper" for PICU coverage by enacting, for

11   anticompetitive purposes, arbitrary and unreasonable rules for PICU alternate coverage and

12   applying them in an anticompetitive manner.  Defendants were thus able to exclude all other

13   competitors from PICU services at GSH, creating an unlawful  market allocation in favor of the

14   NorCal PICU group and a *de facto* exclusive contract for NorCal PICU members.

15       91.        GSH PEC members, including Dr. Tan, GSH MSEC members, including Dr.

16   Douville, and GSH BOT members, during the period from 2004 to the present, in violation of

17   Section 1 of the Sherman Act, *15 U.S.C. § 1*, contracted, combined and conspired with one

18   another and with others, including but not limited to GSH; its officers, including Mr. Piché and

19   Dr. Beaupre; its corporate parent, HCA, Inc., its hospital/medical staff counsel, and Drs.

20   McConnell, Smyklo, and Silva, to maintain an illegal *de facto* exclusive contract for PICU

21   Services GSH.  This was a horizontal market allocation plan, a naked restraint or at lease an

22   unreasonable restraint of trade.

23       92.        By reason of defendants' said unlawful actions and as a direct and proximate

24   result of such actions Dr. Fox has been injured in his businesses and property. As a result, the

25   public has been deprived of free and open competition for PICU services at GSH and Dr. Fox

26   has suffered, and will continue to suffer, extensive damages cognizable under the Sherman Act.

27       93.        Dr. Fox and the public have suffered and will continue to suffer irreparable

28   harm through defendants' aforesaid unlawful actions in violation of Section 1 of the Sherman

*Fox v. Piché, et al.*              **First Amended Complaint**         Case No.  08-CV-0198  RS

1  Act.  Dr. Fox and the public have no adequate remedy at law for this irreparable harm.

2  ### D.  Fourth Claim for Relief

3  **(Against All Defendants)**
**Unreasonable Restraint of Trade – Retaliation**
4  **(Section 1 of the Sherman Act, *15 U.S.C. § 1* and *Cal. Bus. & Prof. Code § 2056*)**

5      94.      Dr. Fox incorporates herein by reference Paragraphs 1 to 93.

6      95.      GSH PEC members, including Dr. Tan, GSH MSEC members, including Dr.

7  Douville, and GSH BOT members, in the period from 2004 to the present entered into

8  contracts, combinations, and conspiracies among themselves and with others, including but not

9  limited to  GSH; its officers, including Mr. Piché and Dr. Beaupre; its corporate parent, HCA,

10  Inc.; its hospital/medical staff counsel; and Drs. McConnell, Smyklo, and Silva for the

11  unlawful purpose of damaging Dr. Fox, in retaliation for Dr. Fox's advocacy, protected *under*

12  *Cal. Bus. & Prof. Code § 2056*, on behalf of patients' rights.  This was done with the intent to

13  unreasonably restrain trade and commerce in PICU Services at GSH, by carrying out a plan to

14  implement an anti-competitive contract for PICU services at GSH, to exclude Dr. Fox from

15  competing for PICU services, and to appropriate Dr. Fox's PICU practice at GSH, all in

16  violation of Section 1 of the Sherman Act, *15 U.S.C. § 1.*

17      96.      By reason of defendants' said unlawful actions and as a direct and proximate

18  result of such actions Dr. Fox has been injured in his businesses and property. As a result, the

19  public has been deprived of free and open competition for PICU services at GSH and Dr. Fox

20  has suffered, and will continue to suffer, extensive damages cognizable under the Sherman Act.

21      97.      Dr. Fox and the public have suffered and will continue to suffer irreparable

22  harm through defendants' aforesaid unlawful actions in violation of Section 1 of the Sherman

23  Act.  Dr. Fox and the public have no adequate remedy at law for this irreparable harm.

24  ### E.  Fifth Claim for Relief

25  **(Against All Defendants)**
**Monopolization and Attempt to Monopolize**
26  **(Section 2 of the Sherman Act, *15 U.S.C. § 2*)**

27      98.      Dr. Fox incorporates herein by reference Paragraphs 1 to 97.

28      99.      Under the facts alleged above, the PEC members, the MSEC members, and the

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

-22-

BOT members, along with CEO Piché, COO Beaupre, GSH, and HCA, Inc., combined and conspired with the NorCal PICU group to monopolize PICU services at GSH. They attempted to and did monopolize PICU services at GSH through denial of PICU privileges to Dr. Fox. They excluded the only other competitor, Dr. Fox, from competing to provide PICU services at GSH. They excluded all competitors other than their own contracted group, the NorCal PICU group, and maintained supracompetitive prices for PICU services at GSH.

100.    These actions and these combinations and conspiracies created a dangerous probability that the hospital's contracted group would achieve, and they did in fact achieve and maintain a monopoly with over a 90% market share of the relevant market for PICU services at GSH from 2004 to the present.

101.    The purposes and effects of the actions of PEC members, including Dr. Tan, MSEC members, including Dr. Douville, and BOT members, acting with GSH; its officers, including William Piché and Dr. Paul Beaupre, its hospital/medical staff counsel; and Drs. McConnell, Smyklo, and Silva; as set out above, were to attempt to monopolize, to monopolize, and to maintain a monopoly for PICU services at GSH. They constitute an unlawful attempt to monopolize, monopolization, and maintenance of a monopoly and unlawful combinations and conspiracies to monopolize in the PICU services market at GSH, pursuant to Section 2 of the Sherman Act, *15 U.S.C. § 2.*

102.    By reason of defendants' said unlawful actions and as a direct and proximate result of such actions Dr. Fox has been injured in his businesses and property. As a result, the public has been deprived of free and open competition for PICU services at GSH and Dr. Fox has suffered, and will continue to suffer, extensive damages cognizable under the Sherman Act.

103.    Dr. Fox and the public have suffered and will continue to suffer irreparable harm through defendants' aforesaid unlawful actions in violation of Section 2 of the Sherman Act. Dr. Fox and the public have no adequate remedy at law for this irreparable harm.

/ / / / /

/ / / / /

/ / / / /

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

### F.   Sixth Claim for Relief

**(Against All Defendants)**
**Retaliation – Withholding of Hospital Privileges in Violation of Public Policy**
*(Calif. Bus. & Prof. Code  § 2056)*

104.   Dr. Fox incorporates herein by reference Paragraphs 1 to 103.

105   The retaliation against Dr. Fox by GSH's PEC members, GSH's MSEC members, and GSH's BOT members in this case involves Dr. Fox's on-going complaints to GSH on behalf of nurses and other doctors about patient care problems beginning in 1992.

106.   Two incidents in which Dr. Fox reported violations of patients' rights to the State of California, in 1996 and 1999 resulted in the State citing GSH for violations.  Dr. Fox was told by another doctor to "watch your back" after a hearing on one of his complaints. GSH (and HCA after it took over the Hospital in 1996) expressed extreme displeasure at Dr. Fox engaging in such "whistle-blowing."

107.   GSH had, in 1997, begun PICU transfers from GSH to San Jose Medical Center in violation of EMTALA, a federal law preventing transfer of emergency room patients.  Dr. Fox raised the violation with the Medical Staff Executive Committee in November 1999 and at the same meeting the committee decided to uphold the suspension of Dr. Fox's PICU privileges.

108.   In 2006, when Dr. Fox declined to sign the HCA corporate loyalty oath requiring him to put HCA's profits ahead of his patients, Dr. Fox stated that to do so would interfere with his duty to advocate on behalf of his patients,

109.   GSH PEC members, including Dr. Tan, GSH MSEC members, including Dr. Douville, and GSH BOT members entered into an ongoing civil conspiracy among themselves and with others, including but not limited to GSH; its officers, including William Piché and Dr. Paul Beaupre;  its corporate parent, HCA, Inc.; its hospital/medical staff counsel; and Drs. McConnell, Smyklo, and Silva, with the common plan and the intent to exclude Dr. Fox from practice at GSH and to otherwise damage Dr. Fox by suspending and withholding his PICU privileges, in retaliation for Dr. Fox's advocacy on behalf of patients' rights, advocacy protected under *Cal. Bus. & Prof. Code § 2056.*

110.   Defendants in combination and individually engaged in acts of retaliation against

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

Dr. Fox from 2004 into 2008 for his complaints about quality of care issues in violation of California statutes which protect doctors who make complaints about quality of care issues from retaliation  through privileging.  *Cal. Bus. & Prof. Code § 2056.*

111.    As a direct, proximate, and foreseeable result, Dr. Fox has suffered and will continue to suffer, extensive general and special damages.  Dr. Fox has suffered loss of reputation, shame, despair, humiliation, embarrassment, depression, and severe emotional distress resulting in damages in an amount in excess of the minimum jurisdiction of this court, the precise amount of which will be proven at the time of trial. These damages include lost earnings and certain other incidental and consequential damages and losses.

112    In retaliating against Dr. Fox, defendants engaged in oppression, fraud and malice toward Dr. Fox.  Defendants repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful, and strong medicine is required to cure the defendants' disrespect for the law.  Dr. Fox is therefore entitled to punitive damages based, *inter alia,* on defendants' intent to injure Dr. Fox, wilful and conscious disregard of his rights, and despicable conduct subjecting Dr. Fox to cruel and unjust hardship, in an amount to be proven at trial.

### G.  Seventh Claim for Relief

**(Against Defendants Piché and Beaupre)**
**Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**
**(California Common Law)**

113.    Dr. Fox incorporates herein by reference Paragraphs 1 to 112.

114.    GSH's Hospital By-Laws provide for, *inter alia*: appointment and reappointment of members of its medical staff; organization of the Medical Staff with appropriate officers and bylaws; taking  reasonable steps to conform to all applicable federal, state, and local laws and regulations; and, requiring that the Medical Staff establish controls that are designed to ensure the achievement and maintenance of high standards of professional ethical practices.

115.    An implied-in-fact contract arose with Dr. Fox under which the Hospital agreed to abide by the Hospital Bylaws and the Medical Staff Bylaws to preserve Dr. Fox's privileges and business at the Hospital ("Bylaws Contract").

116.    Dr. Fox signed agreements, submitted with each application for privileges,

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

agreeing to abide by these Hospital Bylaws and Hospital rules and regulations enacted under these Bylaws. These created express contracts with the Hospital ("Privileging Agreements").

117.    The Bylaws Contract and Privileging Agreements were contracts between GSH and Dr. Fox supported by, *inter alia,* the consideration Dr. Fox provided GSH by referring patients to the hospital and by the hospital's consideration to Dr. Fox in allowing him to use its facilities to treat his patients there.

118.    The GSH BOT members conspired to undertake a bad faith course of dealing with Dr. Fox including: (a) pervasive denial of required fair procedure including summary suspension and repeated denial of hearing and appeal rights under the Hospital and Medical Staff Bylaws; (b) arbitrary and discriminatory rule-making and rule enforcement; (c) constructively denying reappointment of Dr. Fox to the medical staff in 2006 without cause and without required rights of notice and hearing.  This course of conduct fails to meet the standards required by *42 U.S.C. § 11112(a).*

119.    The purpose and effect of this bad faith course of conduct has been to: (1) exclude Dr. Fox from providing pediatric critical care services at GSH; (2) create a hostile environment in which Dr. Fox would henceforth be unable to practice his specialties or to compete with Hospital's employed physician group; (3) to intimidate Dr. Fox's colleagues and referral sources to discourage them from associating with Dr. Fox, providing alternate coverage for him, or referring patients to him, and (4) to damage Dr. Fox's professional reputation.  These actions breached the Hospital and Medical Staff Bylaws Contract and Privileging Agreements and their implied covenant of good faith and fair dealing.

120.    The Hospital Bylaws,  Medical Staff Bylaws, and Privileging Agreements contain agreements by the parties to them and implied covenants of good faith and fair dealing which obligated the BOT members to perform the terms and conditions of these contracts  fairly and in good faith.

121.    Dr. Fox performed on his part of all the agreements contained in the Hospital Bylaws, Medical Staff Bylaws, and Privileging Agreements to be performed by him except those which were excused or prevented by defendants.

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

122.   As a direct, proximate and foreseeable result of the breach of the agreements and implied covenant of good faith and fair dealing by defendants Piché and Beaupre and the other GS BOT members, Dr. Fox has suffered, and will continue to suffer general and special damages.  As a further, direct, proximate, and foreseeable result of the conduct of said defendants Dr. Fox has suffered loss of reputation, shame, despair, humiliation, embarrassment, depression, and severe emotional distress, resulting in damages in an amount in excess of the minimum jurisdiction of this court, to be proven at the time of trial. These damages include lost earnings and certain other incidental and consequential damages and losses.

## H.   Eighth Claim for Relief

**(Against All Defendants)**
**Interference With Prospective Economic Relations**
**(California Common Law)**

123.   Dr. Fox incorporates herein by reference Paragraphs 1 to 122.

124.   Dr. Fox was involved in a valid and existing business relationship with various members of the Medical Staff of GSH, including but not limited to Drs.  McCracken, Dahlstrom, Abi-Hanna, Piramoon, Kanel, Arnstein, Berkowitz, Singleton, Mendoza, the RAMBLC group, other physicians not on the medical staff of GSH, and nurses at GSH, all of whom regularly referred patients to Dr. Fox for consultation and treatment ("Referral Sources").

125.   Defendants knew of the relationships between Dr. Fox and his Referral Sources through, *inter alia,* medical staff and hospital records.

126.   Defendants, acting with and through other participants in their unlawful acts, intentionally and unlawfully disrupted the relationship between Dr. Fox and his referral sources by the following independently unlawful acts: (a) repeated and unlawful "withholding" and "deferral" of Dr. Fox's PICU privileges, continuing from 2004 to the present; (b) interference with Dr. Mendoza's application for PVM privileges; (c) adoption of the sham "board prepared" requirement in 2004, (d) denial of PICU privileges for lack of call coverage in 2006, despite the naming of the required NorCal PICU group as coverage, (e) termination of all medical staff privileges by constructively denying reappointment in 2006-2008.

127.   PEC members, including Dr. Tan, MSEC members, including Drs. Douville and

*Fox v. Piché, et al.*          **First Amended Complaint**          Case No.  08-CV-0198  RS

-27-

1  Ronquillo, and the BOT Members entered into an ongoing civil conspiracy among themselves

2  and with others, including but not limited to GSH; its officers, including Piché and Dr.

3  Beaupre; its corporate parent, HCA, Inc., its hospital/medical staff counsel, and Drs.

4  McConnell, Smyklo, and Silva, with the intent to disrupt the relationships between Dr. Fox and

5  his Referral Sources and the patients they would refer.

6      128.    As a direct, proximate and foreseeable result of defendants' intentional and

7  unlawful acts, the business relationships between Dr. Fox and his Referral Sources and potential

8  patients were disrupted and Dr. Fox suffered general and special damages in an amount to be

9  proven at trial.

10                    **VI.    PRAYER FOR RELIEF**

11  WHEREFORE:   Dr. Fox prays that the Court order, adjudge, and decree:

12      A.    Defendants' conduct, as alleged in the First-Fourth Claims for Relief, unlawful

13            under Section 1 of the Sherman Act (15 U.S.C. § 1) and defendants' conduct, as

14            alleged in the Fifth Claim for Relief, unlawful under Section 2 of the Sherman

15            Act (15 U.S.C. § 2);

16      B.    Plaintiff Richard B. Fox  recover from defendants, jointly and severally, threefold

17            his damages suffered by reason of the federal antitrust law violations, his costs

18            and reasonable attorneys' fees, pursuant to section 4 of the Clayton Act, (15

19            U.S.C. § 15);

20      C.    Defendants' conduct, as alleged in the Sixth-Eighth Claims for Relief , unlawful

21            under California law;

22      D.    Plaintiff recover from defendants, jointly and severally, his general and special

23            damages according to proof at trial;

24      E.    Plaintiff recover from defendants, jointly and severally,  punitive and exemplary

25            damages for retaliation and tortious interference;

26      F.    Plaintiff recover from defendants, jointly and severally, prejudgment and post-

27            judgment interest; and

28

*Fox v. Piché, et al.*        **First Amended Complaint**        Case No.  08-CV-0198 RS

1       G.      Plaintiff be awarded such other and further relief in law or in equity as the Court

2       may deem just and proper in the premises.

Dated: March 18, 2008                   HENNEFER, FINLEY & WOOD

By      /s/ James A. Hennefer

James A. Hennefer
Attorneys for Richard B. Fox, M.D.

**DEMAND FOR JURY TRIAL**

Pursuant to the Seventh Amendment to the Constitution of the United States, Rule 38(a) and (b) of the Federal Rules of Civil Procedure, and similar provisions of any state of the United States that apply, Plaintiff demands a trial by jury of all issues triable of right by jury.

Dated: March 18, 2008                                  HENNEFER, FINLEY & WOOD

By _____ s/s James A. Hennefer _____

James A. Hennefer
Attorneys for Richard B. Fox, M.D.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Fox v. Piché, et al.*    **First Amended Complaint**    Case No.  08-CV-0198  RS