James A. Hennefer (SBN 059490)
Joseph Wood (SBN 103596)
HENNEFER, FINLEY & WOOD
425 California Street, 19th Floor
San Francisco, CA 94104-2296
Telephone: (415) 421-6100
Facsimile:  (415) 421-1815

Attorneys for Plaintiff
RICHARD B. FOX, M.D.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Richard B. Fox, M.D.;<br><br>Plaintiff,<br><br>vs.<br><br>William Piché, Paul N. Beaupre, M.D., Arthur W. Douville, M.D., Mark S. McConnell, M.D.,  and Kenneth I. Tan, M.D.;<br>Defendants.<br>_____ | CASE NO.     08-CV-01098 RS<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FEDERAL RULE 12(b)(6)**<br>_____<br><br>Date:   August 20, 2008<br>Time:  9:30 a.m.<br>Place:  Courtroom 4<br>Judge: Honorable Richard Seeborg |

TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ALLEGATIONS IN THE FAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   General Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.   Wrongful Actions From April 2004 Through January 2008 . . . . . . . . . . . . . . . . . . 4

           1.   Dr. Mendoza Withdraws Application and Dr. Fox's
                Privileges Request Is Again "Deferred" In April 2004 . . . . . . . . . . . . . 4

           2.   Withholding and Deferral of Dr. Fox's Privilege Requests
                In 2004, 2006, 2007, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           3.   Defendants Change the Rules, Again In May-June 2004 . . . . . . . . . . . . . 5

           4.   The "Board Certified or Board Prepared" Rule Is Adopted
                And Requirements Are Arbitrarily Enforced In
                2005, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           5.   The Loyalty Oath Requirement Causes Termination of
                Dr. Fox's Privileges In April-June 2006 . . . . . . . . . . . . . . . . . . . . . . . . 6

           6.   Defendants Repeatedly Refuse To Send Dr. Fox
                His Biennial Reappointment Letter Through December 2007 . . . . . . . . . 6

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.   Fed. R. Civ. P. 12(b)(6) Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.   Dr. Fox's Claims in the FAC are Not Barred by the Applicable
           Statutes of Limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           1.   Dr. Fox's Antitrust Claims Are Not Time Barred . . . . . . . . . . . . . . . . . . 9

           2.   Dr. Fox's State Law Claims Are Not Time Barred . . . . . . . . . . . . . . . . . 12

      C.   Dr. Fox Adequately Alleges in the FAC Effect on
           Interstate Commerce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      D.   Challenges to the Legal Sufficiency of the Claims in the FAC . . . . . . . . . . . . . . 15

           1.   The FAC Adequately Alleges a Contract, Combination,
                Or Conspiracy Under Section 1 of the Sherman Act . . . . . . . . . . . . . . . . 15

           2.   The FAC Adequately Alleges a Monopoly Claim
                Under Section 2 of the Sherman Act . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           3.   The FAC Adequately Alleges All State Law Claims . . . . . . . . . . . . . . . . 17

---

*Fox v. Piché, et al.*   **MEMORANDUM IN OPP TO MOTION TO DISMISS**   Case No.  08-CV-0198  RS

a.    The FAC Adequately Alleges a Claim for
Retaliation In Violation of California Law . . . . . . . . . . . . . . . . . . 17

b.    The FAC Adequately Alleges A Claim For
Breach of the Implied Covenant of Good Faith
And Fair Dealing In Violation of California Law . . . . . . . . . . . . . 18

i.    Good Samaritan Hospital Bylaws Are
Contractual Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ii.    Breach of the Covenant of Good Faith
And Fair Dealing in the Hospital
Bylaws Contract is Tortious . . . . . . . . . . . . . . . . . . . . . . . 19

iii.    Defendants Piché and Beaupre Are
Liable for the Tortious Violations of
Good Faith and Fair Dealing by Good
Samaritan Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

c.    The FAC Adequately Alleges a Claim for
Tortious Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i.    Independently Wrongful Acts . . . . . . . . . . . . . . . . . . . . . 21

ii.    Actual Economic Relationships
Disrupted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.  IF ANY PORTION OF THE FAC IS DEEMED DEFICIENT,
LEAVE TO FILE AN AMENDED COMPLAINT SHOULD BE GRANTED . . . . . . . . . . 23

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198  RS

1

TABLE OF AUTHORITIES

2

CASES                                                                                              PAGES

3

*AMF, Inc. v. General Motors Corp.,*
    591 F.2d 68 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 12

4

*Airweld, Inc., v. Airco, Inc.,*
    742 F.2d 1184 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5

*Ascherman v. Saint Francis Memorial Hospital,*
    45 Cal. App. 3d 507 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

6

7

*Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.,*
    688 F.2d 689 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8

*Bell Atlantic Corp v. Twombly,*
    ___ U.S. ___, 127 S Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 15, 16

9

10

*Columbia Steel Casting Co. v. Portland General Elec. Co.,*
    111 F.3d 1427 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

11

*Conley v. Gibson,*
    355 U.S. 41, 78 S. Ct. 99 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12

13

*Cost Management Services, Inc. v. Washington Natural Gas Co.,*
    99 F.3d 937 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14

*County of Tuolomne v. Sonora Community Hosp.,*
    236 F.3d 1148 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15

16

*DCD Programs, Ltd. V. Leighton,*
    *833 F.2d 183 (9th Cir. 1987)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

17

*Erickson v. Pardus,*
    ___ U.S. ___, 127 S. Ct. 2197 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18

19

*Ernest W. Hahn, Inc. v. Codding,*
    615 F.2d 830 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

20

*Fednav Ltd. v. Sterling International,*
    572 F. Supp. 1268 (N.D. Cal. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21

22

*Fisher v. San Pedro Peninsula Hosp.,*
    214 Cal. App. 590 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

23

*Foley v. Interactive Data Corp.,*
    47 Cal. 3d 654 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

24

25

*Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive*
    *Board of Culinary Workers,* 542 F2d 1076 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . 9

26

27

*Freeman v. San Diego Ass'n of Realtors,*
    322 F.3d 1133 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198 RS

*Gilligan v. Jamco,*
   108 F.3d 246 (____) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Grisham v. Philip Morris U.S.A., Inc.,*
   40 Cal. 4th 623 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Hennegan v. Pacifico Creative Serv., Inc.,*
   787 F.2d 1299 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

*Hospital Building Co. v. Trustees of Rex Hospital,*
   425 U.S. 738, 96 S. Ct. 1848  (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Janda v. Madera Cmty. Hosp.,*
   16 F. Supp. 2d 1181 (E.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*LaSalvia v. United Dairymen of Arizona,*
   804 F.2d (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,*
   507 U.S. 163, 113 S. Ct. (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*McLain v. Real Estate Bd. Of New Orleans, Inc.,*
   444 U.S. 232 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Moore v. Kayport Package Express, Inc.,*
   885 F.2d 531 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Newman v. Universal Pictures,*
   813 F.2d 1519 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*O'Byrne v Santa Monica-UCLA Medical Ctr.,*
   94 Cal. App. 4th 797 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Oltz v. St. Peter's Community Hosp.,*
   861 F.2d 1440 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pace Industries, Inc. v. Three Phoenix Co.,*
   813 F.2d 234 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10, 11

*Paladin Associates, Inc. v. Montana Power Co.,*
   328 F.3d 1145 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan,*
   662 F.2d 641 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Reddy v. Litton Industries, Inc.,*
   912 F.2d 291 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Rosenberg Bros. & Co. v. Arnold,*
   283 F.2d 406 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Scheuer v. Rhodes,*
   416 U.S. 232, 94 S. Ct. 1683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Silver v. Castle Memorial Hospital,*
    53 Hawaii 563 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Summit Health, Ltd. v. Pinhas,*
    500 U.S. 322 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Usher v. City of Los Angeles,*
    828 F.2d 556 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Employing Plasterers' Ass'n,*
    347 U.S. 186, 74 S. Ct. 452 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Webb,*
    655 F.2d 977 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Yellow Cab Co.,*
    332 U.S. 218 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Walker Distributing Co. v. Lucky Lager Brewing Co.,*
    323 F.2d (9th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Wyatt v. Union Mortgage Co.,*
    24 Cal. 3d 773 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 17, 21

<u>STATUTES</u>

Cal. Admin. Code § 70701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

California Business & Professions Code § 2056 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

California Code of Civil Procedure § 339 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Federal Rules of Civil Procedure 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 8, 16

Federal Rules of Civil Procedure 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Federal Rules of Civil Procedure 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Rest. 2d Contracts, § 205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15 U.S.C. § 15 (Clayton Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15 U.S.C. § 1  (Sherman Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

15 U.S.C. § 2  (Sherman Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17

42 U.S.C. § 11101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

---

1   Plaintiff Richard B. Fox, M.D. ("Dr. Fox", or "Plaintiff") hereby submits this memorandum

2   of points and authorities in opposition to the motion of defendants William Piché, Paul N.

3   Beaupre, M.D., Arthur W. Douville, M.D., and Kenneth I. Tan, M.D. ("Defendants") to dismiss all

4   of the claims of the First Amended Complaint ("FAC") in this action, pursuant to Fed. R. Civ. P.

5   Rule 12(b)(6)

6   **I.    INTRODUCTION**

7   Defendants move to dismiss Dr. Fox's entire FAC.  They do so based on a flawed view of

8   the legal standards guiding Rule 12(b)(6), assuming, without careful analysis, that the Supreme

9   Court in *Twombly* revolutionized Federal pleading under Rule 8. This is not the case, as the Court

10  noted in its order in this case of February 25, 2008 (see, page 7, fn.5, below) and as a fair reading

11  of *Twombly* reveals (see, III.A, below).  The ample facts pleaded in the FAC more than meet the

12  requirements for Rule 8 notice pleading, as to each of the claims for relief.

13  Starting with a flawed legal standard, Defendants conveniently omit clearly controlling

14  authority on key legal issues, including Ninth Circuit authority (*Columbia Steel/Hennegan* on the

15  antitrust statue of limitations), California Supreme Court authority (*Wyatt* on continuing conspiracy

16  and state statute of limitations) and even United States Supreme Court authority (*Summit Health* on

17  interstate commerce for antitrust doctor-privileging claims).  (See, Sections III.B.1., III.B 2. and

18  III.C., below.)  Defendants' legal authority and analysis on the remaining issues fares no better.

19  The fundamental problem that Defendants have, and avoid discussing in their motion, is

20  that  the FAC is replete with allegations of material facts supporting each claim for relief.  Like the

21  complaint Dr. Fox filed in on March 18, 2004 in the related case, *Fox v. Good Samaritan Hospital*,

22  the FAC alleges sufficient facts to go to trial on the issue of a continuing conspiracy going back to

23  1992 and continuing to 2008 -- facts found by Judge Whyte in denying summary judgment in that

24  case on this issue "sufficient to raise a triable issue of fact on whether the Hospital and the Medical

25  Staff unlawfully conspired to exclude Dr. Fox from offering his PICU and PVM care at Good

26  Samaritan."  The FAC adds substantial facts bolstering those before Judge Whyte on this issue.

27  The individual Defendants, each involved in actions of the Hospital and the Medical Staff referred

28

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198 RS

to in Judge Whyte's order, participated in the acts to exclude Dr. Fox referred to in his order and thereafter from 2004-2008.  (See, page 16 below.)   Defendants' attempts to escape entirely responsibility for their acts by a Rule 12(b)(6) motion should be to no avail.

## II.    ALLEGATIONS IN THE FAC

### A.    General Facts

Dr. Fox, is a well-credentialed, very highly skilled pediatric intensive care ("PIC") and pediatric pulmonology physician who has an impeccable record.   Dr. Fox had full medical privileges at Good Samaritan Hospital ("GSH"), including all privileges required for him to practice his board-certified specialties in the Pediatric Intensive Care Unit ("PIC Privileges"), until 1999 when the actions denying him privileges began. These actions have continued unabated into 2008.  Dr. Fox has never been able to regain his full privileges. (FAC ¶ 1) "PICU Privileges" for Dr. Fox include Pediatric Critical Care without consultation, Pediatric Ventilator Management ("PVM"), and Pediatric Intensive Care ("PIC") – the package necessary for Dr. Fox to practice both of his board-certified  specialties, Pediatric Critical Care and Pediatric Pulmonology and to render full "PICU Services."  (FAC ¶ 3)  GSH[1] changed the privilege categories and their requirements and they suspended, withheld, deferred or denied various iterations of these privileges so that after 1999 Dr. Fox was never able to regain the entire package of PICU Privileges necessary to render full PICU Services as before.   (*Id.*)

This action is against the CEO of GSH William Piché ("Piché") and Dr. Paul Beaupre ("Dr. Beaupre"), GSH's COO; against the GSH MSEC chairperson and member Dr. Arthur Douville ("Dr. Douville"); against  the owner of a competing PIC Services provider at GSH Dr. Mark McConnell ("Dr. McConnell"); and against the GSH's PEC Member and a partner in a neonatal intensive care services affiliate of Dr. McConnell's group, Dr. Kenneth Tan ("Dr. Tan").  (FAC ¶ 2). The action was brought because these individual defendants, from 2004 through 2008,

---

[1] GSH is used in this brief, for purposes of brevity, where further specification is not required, as a shorthand term for the various entities and persons that make up the structure of Good Samaritan Hospital and operate it. For, example, privileging actions for Dr. Fox were handled for GSH by the Pediatric Executive Committee ("PEC"), Medical Staff Executive Committee ("MSEC") and Board of Trustees ("BOT") and the members of each of these, including Defendants. (FAC ¶¶ 9, 11-15).

---

repeatedly acted to suspend, withhold, defer and deny the "PIC Privileges" needed for Dr. Fox to provide "PIC Services" at GSH.   Dr. Fox's exclusion from providing PIC Services at GSH has been based on arbitrary and sham pretexts, was for retaliatory and anticompetitive purposes in the self interests of defendants and was for reasons having nothing to do with legitimate considerations, such as Dr. Fox's qualifications, skill or quality of patient care.

Each of these defendants took an active role in these repeated illegal suspensions, withholding, deferrals and denials of Dr. Fox's privileges in the period from 2004 through 2008.  Dr. Fox's alternate call physicians, Dr. McCracken and Dr. Dahlstrom, highly skilled and credentialed, like Dr. Fox who had been appropriate for this for years were suddenly not qualified.  (FAC ¶ 3)

Defendants, under California law, were charged with the authority to privilege doctors and entrusted to exercise  independent judgment, through GSH's Medical Staff, for privileging and the operation of GSH in the interest of patients and the community (22 California Admin. Code § 70701 et seq.).  Had they done so, they would have been immune from liability under federal law. (Health Care Quality Improvement Act ("HCQA"), 42 U.S.C. § 11101 et seq.)  Instead, they abused their public trust and neglected their legal duties to PICU patients, GSH doctors, including Dr. Fox and the community. They did so in order to advance HCA's and their own personal economic interests by excluding Dr. Fox from offering PICU Services at GSH. (FAC ¶ 4)

Defendants thereby damaged competition, PICU patients and Dr. Fox, through unreasonable restraints of trade and monopolization of PICU Services at GSH. (Sherman Act, Sections 1 and 2, 15 U.S.C. §§ 1 and 2, Claims I - V.)  Instead of basing their privileging on the best interests of GSH and its patients and the qualifications of physicians, they retaliated against Dr. Fox for advocating patient rights and HCA's compliance with the law, in violation of California law (California Business & Professions Code § 2056, Claim VI), violated contractual agreements with Dr. Fox or for his benefit (Claim VII), and interfered with Dr. Fox's PICU business relations (Claim VIII). (*Id.*)

HCA and the GSH Medical Staff organization are defendants in a previous and related action filed in this court by Dr. Fox ("2004 Action").   GSH's for-profit owner, HCA, and its

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198 RS

affiliates took over the non-profit GSH in 1996. HCA immediately involved GSH in a nationwide Medicare fraud scheme (for which HCA pled guilty to a criminal indictment in 2002) and in other illegal acts, including EMTALA violations by transferring children out of their emergency room to an affiliate to spread the patients among HCA hospitals. HCA secured the cooperation of the individual defendants herein, through: (a) direct employment of them (Piché, Beaupre); (b) appointment of them to GSH positions (Piché, Beaupre, Douville); and (c) its contracts with them (McConnell, Tan). With defendants' active participation, HCA and GSH were able to violate or avoid legal requirements for "privileging" of Dr. Fox, retaliate against Dr. Fox for patient advocacy, and exclude Dr. Fox from providing PICU Services at GSH. (FAC ¶¶ 5, 35-45)

### B. Wrongful Actions From April 2004 Through January 2008

#### 1. Dr. Mendoza Withdraws Application and Dr. Fox's Privileges Request Is Again "Deferred" In April 2004

The very next day after the complaint in the 2004 Action was filed (a complaint that detailed pressure being applied to Dr. Mendoza to withdraw his application to provide alternate call coverage for Dr. Fox) unbeknownst to Dr. Fox, Defendants coerced Dr. Mendoza into withdrawing his application to provide that alternate call coverage. (FAC ¶ 48) Defendants did not disclose that withdrawal to Dr. Fox until he filed a mandamus action in state court in the fall of 2004 when they disclosed it to defeat that action. Instead, to "hide the ball" the MSEC members and the BOT members, had, in April of 2004 once again "deferred" Dr. Fox's request for the PMV Privilege – although "deferral" is of a requested privilege is not authorized by GSH's Medical Staff Bylaws. (FAC ¶¶ 46-47)

#### 2. Withholding and Deferral of Dr. Fox's Privilege Requests In 2004, 2006, 2007, 2008

Despite the fact that the 2004 complaint detailed the denial of Dr. Fox's pediatric ICU privileges by non-reviewable privilege "withholdings" and "deferrals" in violation of their own Medical Staff Bylaws and of California law, Defendants have continued with these same unlawful privilege withholdings and deferrals, right up to the present time. Dr. Fox's 2004 privilege

application was "deferred" by Defendants in May 2004 (FAC ¶ 46), again in May 2006 (FAC ¶ 54), again in December 2007 (FAC ¶ 65), and most recently in January 2008 (FAC ¶ 67).

### 3.    Defendants Change the Rules, Again In May-June 2004

Despite the fact that the 2004 complaint alleged that Defendants had adopted alternate call coverage rules for pediatric intensive care in 1999 that were unnecessary and only served to restrain trade, Defendants then proceeded, after that complaint was filed, to adopt new rules in 2004 requiring applicants for pediatric ICU privileges to be either "board certified or board prepared" in pediatric critical care medicine, knowing full well that there is no such thing as "board prepared"  (FAC ¶¶ 50-51).  The "board certified" requirement was adopted to exclude Dr. Fox's alternates Dr. McCracken and Dahlstrom while the sham "board prepared" requirement was adopted to include Defendants' contractor, Dr. Smyklo, who couldn't pass the board exam.  (FAC ¶ 50)

### 4.    The "Board Certified or Board Prepared"  Rule Is Adopted and Requirements Are Arbitrarily Enforced In 2005, 2006

Defendants enforced the new "Board Certified or Board Prepared" rule in an arbitrary and capricious way to exclude Dr. Fox's alternate, Dr. McCracken, by applying the "Board Certified" in pediatric critical care requirement to her.  (FAC ¶ 52)  Then they applied the sham "board prepared" requirement to qualify the Defendants' contractor, Dr. Smyklo, who couldn't pass the board certification examination in pediatric critical care.  (*Id.*)  In another example of arbitrary enforcement, Dr. Silva was allowed to list, as his alternates, Dr. Smyklo, who was only "board prepared," and Dr. Tan, who was a neonatal specialist who didn't do pediatric intensive care at all.  (FAC  ¶ 53)  However, the approval for this was straightforward since Dr. Tan, as chairman of the Department of Pediatrics, merely approved himself as Dr. Silva's alternate. ( *Id.*)

Later, in an effort to get more names of board certified pediatric ICU specialists that could be used by Drs. Silva and Smyklo to meet the requirements of this rule, they and the Defendants arranged a contract with a pediatric ICU group headquartered in Las Vegas, Nevada.  (FAC ¶ 60)  That group provided several names of board certified pediatric ICU specialists, none of whom lives anywhere in Northern California, and all of whom mostly work in Las Vegas or Southern

---

1   California.  (*Id.*)

2   The head of that group, Dr. Swift, was proposed to Dr. Fox as an alternate who would

3   satisfy the requirement for alternate coverage should Dr. Fox be suddenly and unexpectedly

4   unavailable.  Dr. Swift's main office is in Las Vegas at the Sunrise Children's Hospital but he

5   directs pediatric units at Encino-Tarzana Regional Medical Center, the Riverside County Regional

6   Medical Center, the  Cottage Children's Hospital in Santa Barbara, the Washoe Medical Center in

7   Reno, Nevada, the Community Hospital of Missoula, Montana, and at the Sierra Vista Regional

8   Medical Center in San Luis Obispo, California.  (FAC ¶ 61)

9   **5.    The Loyalty Oath Requirement Causes Termination of Dr. Fox's
           Privileges In April-June 2006**

10  Then, in 2006, Defendants adopted on behalf of the entire medical staff at Good Samaritan

11  an HCA-created loyalty oath that required, as a condition of medical staff membership, that the

12  doctors agree that they "will act in the best interest of the Company…at all times during [their]

13  relationship with the Company."  (FAC ¶ 55)  When Dr. Fox declined to sign this agreement

14  because it would conflict with his duties to always put the interests of his patients first under both

15  California law and the Hippocratic Oath, he was told that he would be terminated from the medical

16  staff.  (*Id.*)  When Dr. Fox still refused to sign the loyalty oath that put profits ahead of patients, he

17  was not formally terminated but, instead, Good Samaritan simply refused to send him his biennial

18  medical staff reappointment letter reappointment letter, without which Dr. Fox could not practice

19  at Good Samaritan at all.  This was in retaliation for his attack on the HCA loyalty oath.  (FAC ¶

20  56)

21  **6.    Defendants Repeatedly Refuse To Send Dr. Fox
           His Biennial Reappointment Letter Through December 2007**

22

23  When, in the fall of 2007, Dr. Fox again complained of not receiving his reappointment

24  letter, he was told that it was an "oversight."  (FAC ¶¶ 62-63)  When Dr. Fox's counsel

25  complained about this to hospital and medical staff counsel in this case, he was told that "Dr. Fox

26  did not receive the standard letter from Mr. Piché notifying him of final Board of Trustees'

27  approval of his reappointment," and, by implication, would not be getting one. (FAC ¶ 65)  This

28

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198 RS

1  was as recently as December 3, 2007, two and one half months before the complaint in this action

2  was filed.

3  **III.    ARGUMENT**

4       **A.    Fed. R. Civ. P. 12(b)(6) Legal Standards**

5       Defendants rely entirely on *Bell Atlantic Corp v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955

6  (2007) for their "Standard of Review" under Rule 12(b)(6). (Def. Memo, 6:10-24) Defendants

7  effectively argue that under *Twombly*, a plaintiff must have sufficient facts to be ready for trial (or

8  at least summary judgment) before filing the complaint.  *Twombly* requires no such thing.[2]

9  *Twombly* does not sweep away all of the traditional Rule 8 and Rule 12(b)(6) precedent which

10  went before it, all of which precedent Defendants conveniently fail to cite or address.

11       A motion to dismiss for legal insufficiency under Fed. R. Civ. P. 12(b)(6) is a disfavored

12  motion that is rarely granted and then only in extreme circumstances.  *Hospital Building Co. v.*

13  *Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S. Ct. 1848, 1853 (1976). "On a motion to

14  dismiss..., the court must presume all factual allegations of the complaint to be true and draw all

15

16  _____

17       [2] In *Twombly*, the Supreme Court was presented with a class action which alleged a horizontal
   conspiracy that was "supported" mainly by claims that the remaining Baby Bell telephone companies

18  did not cross into each other's territory to compete.  In the telecommunications industry, where
   "monopoly was the norm" and where it was economically apparent that the "traditional public

19  monopolies" named as defendants "liked the world the way it was, and surely knew the adage about him
   who lives by the sword" (127 S. Ct. at 1972), the Court observed that the allegations of conspiracy were

20  deficient. The Court concluded that a plausible inference of conspiracy could not be inferred solely from
   the fact that these slumbering giant monopolists, with traditionally enfranchised territories, chose not

21  to compete with one another. Rather the Court stated that "a natural explanation for the noncompetition
   alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their

22  neighbors to do the same thing." Id.  The Court observed that it might be possible, in a "traditionally
   unregulated" industry, to infer conspiracy from passive conduct, i.e., not affirmatively competing.  But

23  in the telecommunications industry – which Congress had tried to prod into competing through the 1996
   Telecommunications Act – it was not plausible to infer conspiracy from passive conduct.  The Court

24  ruled, in this unique factual environment, that to sustain a complaint for a Sherman Act § 1 violation
   there must be "enough facts" to make the claim "plausible on its face"and to "nudge[] [the plaintiffs']

25  claims across the line from conceivable to plausible." Id. at 1974.  Indeed, in a case decided very soon
   after *Twombly*, the Supreme Court expressly disavowed the notion underlying that the pleading of

26  "specific facts" is necessary.  In that case, the Court cited *Twombly* for the proposition that "Federal Rule
   of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the

27  pleader is entitled to relief.'  Specific facts are not necessary; the statement need only "'give the
   defendant fair notice of what the . . . claim is and the grounds upon which it resets.'" *Erickson v. Pardus*,

28  __ U.S. __, 127 S. Ct. 2197, 2200 (2007) (per curiam).

_____

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198  RS

1   reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d

2   556, 561 (9th Cir. 1987).

3       The Supreme Court has repeatedly instructed that a district court may not grant a motion to

4   dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no

5   set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S.

6   41, 45-46, 78 S. Ct. 99, 102 (1957). "'The issue is not whether a plaintiff will ultimately prevail but

7   whether the claimant is entitled to offer evidence to support the claims.'" *Gilligan v. Jamco*, 108

8   F.3d 246, 249 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974)).

9       In ruling on a motion to dismiss, "[t]he Court's inquiry is whether the allegations state a

10  sufficient claim under Fed.R.Civ.P. 8(a)." *Fednav Ltd. v. Sterling International*, 572 F. Supp.

11  1268, 1270 (N.D. Cal. 1983).  Rule 8(a) requires only a "short and plain statement of the claim

12  showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Each and every fact need not be

13  set out in detail; the complaint need only outline the claim for relief.  *LaSalvia v. United Dairymen*

14  *of Arizona*, 804 F.2d 1113, 1116 (9th Cir. 1986), cert. denied, 482 U.S. 928 (1987).

15      In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S.

16  163, 167-68, 113 S. Ct. 1160, 1163 (1993), the Supreme Court made clear that no "'heightened

17  pleading standard'" exists for complex civil cases or any other type of case.  See also *United States*

18  *v. Employing Plasterers' Ass'n*, 347 U.S. 186, 189, 74 S. Ct. 452, 454 (1954) ("[W]here a bona fide

19  [antitrust] complaint is filed that charges every element necessary to recover, summary dismissal of

20  a civil case for failure to set out evidential facts can seldom be justified.").  The Ninth Circuit has

21  also consistently held that "notice pleading" principles apply to antitrust cases, which are not to be

22  judged by a higher or different standard than other cases.  *Walker Distributing Co. v. Lucky Lager*

23  *Brewing Co.*, 323 F.2d 1, 3-4 (9th Cir. 1963); *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830,

24  834-35 (9th Cir. 1980). "[A]ntitrust pleadings need not contain great factual specificity." *Portland*

25  *Retail Druggists Ass'n v. Kaiser Foundation Health Plan*, 662 F.2d 641, 648 (9th Cir. 1981), cert.

26  denied, 469 U.S. 1229 (1985).  The antitrust plaintiff "'need only allege sufficient facts from which

27  the court can discern the elements of an injury resulting from an act forbidden by the antitrust

28

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198  RS

laws.'" *Cost Management Services, Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996) (quoting *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987), cert. denied, 486 U.S. 1059 (1988)).

In their papers, Defendants deride Dr. Fox for making "conclusory" allegations. As shown herein, Dr. Fox's allegations are not conclusory but are more than detailed enough to meet the requirements of a notice pleading regime. More fundamentally, the Ninth Circuit has "specifically rejected the notion that it is necessary to plead 'facts' rather than 'conclusions' in such [antitrust] cases." *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076, 1089 (9th Cir. 1976), *cert. denied*, 430 U.S. 940 (1977).

**B.    Dr. Fox's Claims in the FAC are Not Barred by the Applicable Statutes of Limitation**

**1.    Dr. Fox's Antitrust Claims are Not Time Barred**

Defendants first argue that Dr. Fox's antitrust claims are time-barred. Under Section 4 of the Clayton Act, 15 U.S.C. § 15b, private antitrust claims are subject to a four-year statute of limitations. See *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1300 (9th Cir.1986). "A civil cause of action under the [antitrust laws] arises at each time the plaintiff's interest is invaded to his damage, and the statute of limitations begins to run at that time." *Id.* (quoting *AMF, Inc. v. General Motors Corp.*, 591 F.2d 68, 70 (9th Cir.1979)). Plaintiff filed this suit on March 18, 2008, so, any antitrust claim that accrued before March 18, 2004 would otherwise be time-barred unless Dr. Fox's interests were "invaded to his damage" after March 2004.

Defendants claim that each of the acts alleged in the FAC in withholding Dr. Fox's Privileges, from the "deferral" of his PVM privilege approved by the MSEC members on April 9, 2004 (FAC ¶ 46) through the January 28, 2008 notification of the "deferral" of Dr. Fox's request for PICU privileges (FAC ¶ 67), "amounts to no more than a reaffirmation of the ongoing policy to require alternate call coverage by providers with identical privileges." (Def. Memo 7:21-22) Defendants' argument fails on both the law and facts.

In antitrust law, "[a] continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured." *Pace Industries,*

---

1  *Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir.1987) (citing *Hennegan*, 787 F.2d at

2  1300-01). When a continuing violation exists, the limitations period runs from the "last overt act"

3  by the defendant, which must be (1) a new and independent act that is not merely a reaffirmation of

4  a previous decision that (2) inflicts "new and accumulating" injury on the plaintiff. *Id.* at 238.

5       "New and independent acts" may include active enforcement of policies first put into place

6  outside the limitations period. In *Columbia Steel Casting Co. v. Portland General Elec. Co.*, 111

7  F.3d 1427 (9th Cir.1996), a power company refused to sell power to the plaintiff under an

8  18-year-old horizontal market share division agreement. The Ninth Circuit held that the refusal was

9  a new and independent act because the original agreement "was not a permanent and final decision

10  that controlled the later act." 111 F.3d at 1444. Similarly, in *Hennegan*, tour operators diverted

11  customers from plaintiffs' souvenir shop. Although the tour operators had originally agreed to do

12  so more than four years before plaintiffs filed suit, the Ninth Circuit held that the original

13  agreement "did not immediately and permanently destroy the Hennegans' business, nor [was it]

14  'irrevocable, immutable, permanent and final.' " 787 F.2d at 1301. New and accumulating injury

15  was inflicted upon the plaintiffs each time a defendant diverted customers from plaintiffs' business.

16  See also *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1190 (9th Cir.1984) (holding that active

17  enforcement of an illegal tie is an independent act); *Aurora Enterprises, Inc. v. National*

18  *Broadcasting Co., Inc.*, 688 F.2d 689, 694 (9th Cir.1982) (holding that active enforcement of the

19  terms of an illegal contract is a new and independent act).

20       In contrast to *Columbia Steel* and *Hennegan*, the Ninth Circuit has found no continuing

21  violation only in situations in which the act outside the limitations period "completely and

22  permanently excluded [the plaintiff] from the market." *Hennegan*, 787 F.2d at 1301. In *AMF*, 591

23  F.2d 68, four automobile manufacturers collectively refused to buy afterburners from the plaintiff

24  outside the limitations period, deciding instead to manufacture their own afterburners. The *AMF*

25  court reasoned that because the defendants required considerable lead time to integrate afterburners

26  into new cars, the market for plaintiff's new car afterburners "effectively disappeared" then and for

27  the foreseeable future at the point defendants decided to develop their own afterburners. In

28

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No. 08-CV-0198 RS

practice, the decision not to buy from plaintiff was "irrevocable, immutable, permanent, and final." 591 F.2d at 72. Because defendants' decision had the effect of permanently excluding plaintiff from the afterburner market, plaintiff's injury was complete at that time, and it suffered no additional harm within the four-year limitations period.  Dr. Fox, of course, was entitled to apply for privileges on a two-year cycle and had new adverse privileging actions taken against him on almost a yearly basis.

Defendants' reliance on *Pace Industries* is misplaced.  That case is limited to a particular kind of allegation. In *Pace Industries*, the only alleged antitrust violation was the defendants' prosecution of a lawsuit seeking to enforce an assertedly illegal contract. The plaintiff argued that "each phase" of the lawsuit "from the filing of [the] complaint through resolution of the final appeal constituted discrete overt acts which restarted the statute of limitations." Id. at 237. The Ninth Circuit rejected this argument, holding that the filing of the suit was the last overt act for statute of limitations purposes "where the alleged antitrust violation is the attempted enforcement of an illegal contract through the judicial process." *Id.*

This case is more like *Columbia Steel* and *Hennegan* than *AMF* or *Pace*. Although the general policy of Good Samaritan to require alternate call coverage by providers with identical privileges had been in effect since 1999, this policy was not a "permanent and final" decision that forever prevented Dr. Fox from obtaining PICU and PVM privileges. Quite the contrary.  Dr. Fox was legally entitled to apply for these privileges every two years and to try to meet the shifting standards of the identical privileges policy and the application of these standards.[3] Moreover, Good Samaritan could, and did, between April 2004 and January 2008: (a) modify the standards and rules for satisfying the identical privileges policy; (c) apply the rules and policy to include or exclude Dr. Fox or others; and (c) grant Dr. Fox some privileges under the rules and policy or application of them.  For example, in June 2004, Good Samaritan passed a new rule requiring that

---

[3] As Defendants concede, Dr. Fox and other doctors were entitled "to apply for specific clinical privileges within the scope of his or her training and education . . every two years" and Dr. Fox did so. (Def. Memo, *:23-25).  This, alone, is enough to defeat Defendants' antitrust statute of limitations argument.

---

1   applicants for the PICU privilege must be "either board certified or board prepared" in Pediatric

2   Cricical Care Medicine.  This new privileging rule was disparately applied to exclude Dr.

3   McCracken, Dr. Fox's alternate call for the PICU privilege. However, it allowed privileges for Dr.

4   Smyklo, a member of Dr. McConnell's NorCal PICU group and who was not board certified in

5   pediatric critical care medicine because she couldn't pass the board examination presumably

6   because, despite failing the board exam, she was "board prepared."  Good Samaritan also allowed

7   Dr. Tan, who was neither "board certified or board prepared," to act as an alternate call for the

8   NorCal PICU member Dr. Silva. (FAC ¶¶ 50- 54)

9   **2.    Dr. Fox's State Law Claims are Not Time Barred**

10  Defendants next argue that Dr. Fox's three state law claims for retaliation (Sixth Claim for

11  Relief), breach of contract and implied covenant of good faith and fair dealing (Seventh Claim for

12  Relief), and interference with prospective economic relations (Eighth Claim for Relief) are all time

13  barred by California's two year statute of limitations under Cal. Code of Civ. Procedure § 339(1).

14  The California Supreme Court has held that the statute of limitations in an ongoing civil

15  conspiracy does not begin to run on any part of a plaintiff's claim until the "last overt act" pursuant

16  to the conspiracy has been completed.  *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 786 (1979)

17  ("when a civil conspiracy is properly alleged and proved, the statute of limitations does not begin

18  to run on any part of a plaintiff's claims until the "last overt act" pursuant to the conspiracy has

19  been completed."); unanimously reaffirmed in *Grisham v. Philip Morris U.S.A., Inc.,* 40 Cal.4th

20  623, 632 (2007) ("the statute of limitations does not begin to run until the last overt act pursuant to

21  the conspiracy is completed," citing *Wyatt v. Union Mortgage Co.*).

22  In *Wyatt*, the Court noted that:

23  "appellants stood accused of continuing their tortious conduct in furtherance of the
    conspiracy up until and even after the filing of the complaint. It was their own

24  conduct that kept the cause of action against them alive. Therefore, no
    considerations of justice or equity require us to overrule the consistent line of cases

25  that have applied the "last overt act" doctrine to civil conspiracies."

26  *Wyatt*, at 787.

27

28

In his Sixth and Eight Claims for Relief (retaliation and tortious interference), Dr. Fox alleges that these claims are the result of ongoing civil conspiracies among defendants and others. (FAC ¶¶ 109, 127)  Dr. Fox plainly alleges that there is ongoing conduct by some or all defendants pursuant to these conspiracies extending right up to the present time, four years after the filing of the 2004 Action against Good Samaritan Hospital and its medical staff.  (FAC ¶ 67)  It is "their own conduct that kept the cause of action against them alive."  Thus, "no considerations of justice or equity" require this Court to apply a time bar to these claims.

Defendants acknowledge that these claims are pled as ongoing civil conspiracies.  (Def. Memo, 16:21-17:3 and 21:5-8)  However, they conveniently do not even cite or address the *Wyatt* and *Grisham* cases and why the "last overt act" doctrine does not toll the statute of limitations on these claims.  Because Dr. Fox has properly pled ongoing civil conspiracies in support of the Sixth and Eighth Causes of Action, the "last overt act" doctrine tolls the statute of limitations on these claims to the present time.  Thus, these claims are not time barred.

The Seventh Cause of Action for breach of contract and implied covenant of good faith and fair dealing specifically refers to defendants' conduct in the year 2006.  (FAC ¶ 118)  This conduct was within the two year statute of limitations claimed by defendants for contracts.  (Def. Memo, 9:13-16)  Thus, it is not time barred.

### C.     Dr. Fox Adequately Alleges in the FAC Effect on Interstate Commerce.

The test for whether a physician-plaintiff alleging exclusion from a hospital market that results from medical staff hospital privileging activity properly pleads an effect on interstate commerce sufficient to support a Sherman Act violation is not, as defendant's claim, whether the plaintiff's economic activity by itself substantially affects interstate commerce.   Instead, the proper test was set out by the United States Supreme Court in *Summit Health, Ltd. v. Pinhas*, (*"Summit Health"*) 500 U.S. 322, 332-333, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) which Defendants conveniently do not even cite or address.[4]   *Summit Health* stated that the standard of whether the

---

[4] Defendants' failure to address this Supreme Court standard clearly on point is noteworthy in light of the professional responsibility of counsel to bring to the Court's attention relevant controlling authority.

1  medical staff privileging activity itself affects interstate commerce is as follows:

2
3  > The competitive significance of respondent's exclusion from the
   > market must be measured, not just by a particularized evaluation of
   > his own practice, but rather, by a general evaluation of the impact of
4  > the restraint on other participants and potential participants in the
   > market from which he has been excluded.

5  > We have no doubt concerning the power of Congress to regulate a
   > peer review process controlling access to the market for
6  > ophthalmological surgery in Los Angeles. Thus, respondent's claim
   > that members of the peer review committee conspired with others to
7  > abuse that process and thereby deny respondent access to the market
   > for ophthalmological services provided by general hospitals in Los
8  > Angeles has a sufficient nexus with interstate commerce to support
   > federal jurisdiction.

9
   *Summit Health* at 332-333.
10
      As more recently explained by Chief Judge Kozinski, the interstate commerce requirement
11
   in antitrust cases is analyzed by examining the interstate commerce effects of the "infected
12
   activity", not just the infection itself. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133,
13
   1143-1144 (9th Cir. 2003) (where realtor groups were alleged to have conspired to fix prices for
14
   MLS database services, the Court held that, in determining whether interstate commerce is
15
   affected, "we examine the MLS, not the alleged price fixing. Even if the price of the MLS has no
16
   substantial effect on interstate commerce, the MLS itself does.") (citing *McLain v. Real Estate Bd.*
17
   *of New Orleans, Inc.*, 444 U.S. 232, 242-243 [1980]).
18
      Here, Dr. Fox not only alleges that he has been excluded from the pediatric intensive care
19
   market at Good Samaritan Hospital, an activity that involves "interstate commerce in that he
20
   receives patients and significant amounts in payment for his services from sources outside of the
21
   state of California,"  but he also alleges that the exclusion was carried out by a misuse of the
22
   medical staff peer review process, a process that affects interstate commerce.  (FAC ¶¶ 4, 9)  Under
23
   *Summit Health*, this is all that is required to satisfy the interstate commerce jurisdictional
24
   requirement for the antitrust claims in this case.
25
      By contrast, the authorities cited by the defendants were decided prior to *Summit Health*,
26
   and, with one exception, by out-of-circuit and/or inferior courts.  Thus, *Summit Health* supersedes
27
   these earlier cases and clearly controls this issue.  Dr. Fox has clearly met the *Summit Health*
28

---

1  standard.

2  **D.    Challenges to the Legal Sufficiency of the Claims in the FAC**

3      **1.    The FAC Adequately Alleges a Contract, Combination, or Conspiracy Under Section 1 of the Sherman Act**

4      Defendants claim that the FAC's allegations of a "contract, combination, or conspiracy" in

5  restraint of trade are so lacking in factual basis as to be merely conclusory and thus insufficient

6  under the standard in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007). (Def. Memo,

7  10:25-11:3)  Specifically, defendants cite to the FAC ¶¶  78, 86, 91, and 95 as lacking in factual

8  detail.  They, however, fail to acknowledge the factual detail alleged in the FAC, Section IV,

9  entitled "Facts Common to All Claims for Relief," at subsections C and D, entitled "Actions of the

10 Pediatric Executive Committee, Medical Staff Executive Committee, Hospital Board of Trustees

11 from 1996-2003" and "Actions of the Pediatric Executive Committee, Medical Staff Executive

12 Committee, Hospital Board of Trustees from 2004-2008" (FAC ¶¶ 35-67).  These allegations,

13 encompassing approximately ten (10) pages of detailed factual allegations, set forth clearly an

14 ongoing conspiracy in support of the antitrust and state law claims made.  The roles of the

15 individual defendants on the Pediatric Executive Committee, Medical Staff Executive Committee,

16 and Hospital Board of Trustees are set forth in the FAC at ¶¶ 2-5 and 11-15.  These are hardly

17 conclusory allegations.

18     Judge Whyte denied defendants' summary judgment motion on this issue in the 2004

19 Action.  He did so based only on actions of GSH and the Medical Staff up to March 2004.  These

20 actions are pleaded in summary fashion in the 2008 Action.  (FAC  ¶¶ 34-45). None of post March

21 2004 allegations, which are consistent with and buttress Dr. Fox's claim of combination and

22 conspiracy were before Judge Whyte, who nonetheless held:

23          "To establish a claim under Section 1 of the Sherman Act, Plaintiffs must
           show 1) that there was a contract combination or conspiracy; 2) that the agreement
24         unreasonably restrained trade under either a per se rule of illegality or a rule of
           reason analysis; and 3) that the restraint affected interstate commerce." *County of*
25         *Toulomne v. Sonora Community Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001).  The
           phrase 'contract combination or conspiracy' limits application of the Sherman Act
26         [§ 1] to concerted conduct by more than one person or single entity. *Oltz v. St.*
           *Peter's Community Hosp.*, 861 F.2d 1440, 1449 (9th Cir. 1988). . . . Although the
27         court finds Dr. Fox's inferences problematic, it finds them sufficient to raise a

28

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198  RS

1

triable issue of fact on whether the Hospital and the Medical Staff unlawfully
conspired to exclude Dr. Fox from offering his PICU and PVM care at Good
Samaritan. . . .

2

            . . . The facts from which Dr. Fox can argue an unlawful conspiracy can be
inferred include that: (1) he has unquestioned credentials and experience in pediatric
critical care and pulmonology and worked for years without complaint with Dr.
McCracken and Dr. Dahlstrom providing alternate care coverage; (2) his suspension
occurred shortly after he had been warned by the Chief of Medical Staff to "watch
his back" after he had complained about his wife's treatment at the Hospital and
after an unfounded complaint about his placement of a feeding tube in one of his
pediatric patients; (3) his suspension occurred relatively shortly after he reported to
the state incidents of the violation of patients' rights at the Hospital; (4) his
suspension occurred after his outspoken objection to transferring pediatric intensive
care patients to the [HCA] San Jose Medical Center [in violation of EMTALA]; (5)
around the time of his suspension the Hospital was negotiating with Dr. McConnell
to have his group, a group that Dr. Fox felt could not provide adequate alternate call
coverage, provide PICU services at the Hospital; and (6) he Hospital failed to
approve or timely approve privileges applications by physicians Dr. Fox designated
for alternate care coverage.

3

4

5

6

7

8

9

10

11

Case No. 5:04-CV-OO874-RS, filed October 9, 2007, Docket No. 180, pages 9-11

12

    Adding to these facts additional incidents of the same conduct by Defendants as members

13

of the GSH Medical Staff executive committees and GSH Board of Trustees which occurred from

14

March 2004 through January 2008 (FAC ¶¶ 46-67) makes Dr. Fox's "combination or conspiracy

15

case unassailable under a Rule 12(b)(6) motion, in conformance with Rule 8 and Rule 12(b)(6)

16

standards even after *Twombly*.[5]

17

## 2.    The FAC Adequately Alleges a Monopoly Claim Under Section 2 of the Sherman Act

18

    Section 2 of the Sherman Antitrust Act makes it unlawful to "monopolize, or attempt to

19

monopolize, or combine or conspire with any other person or persons, to monopolize any part of

20

21

        [5] The Court has already ruled in this action as to Dr. Fox's more lengthy original Complaint that:
"Rule 8 of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim

22

showing that the pleader is entitled to relief.' Even under the Supreme Court's recent application of that
standard in the antitrust context, a complaint need only contain "enough factual matter (taken as true)"

23

that the allegations of wrongdoing are 'plausible' and not "wholly conclusory." *Bell Atlantic Corp. v.
Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1965, 1968 (2007).  Here, plaintiff's 54 page proposed

24

complaint violates Rule 8.  Moreover, all or virtually all of the hundreds of pages of attached as exhibits
to the proposed complaint appear to be *evidence* that plaintiff contends supports his allegations.

25

Regardless of the degree to which a pleading standard may require a plaintiff to plead *facts*, no pleading
standard in the federal courts require a plaintiff to submit evidence with a complaint." Order, February

26

25, 2008, Docket No. 6, page 2:8-17. Dr. Fox, taking the Court's admonition to heart, eliminated all
exhibits and shortened his factual statements into a 29 page FAC.  To now hold the FAC lacking in

27

factual allegations would seem inequitable.

28

the trade or commerce among the several States." 15 U.S.C. § 2. To allege a conspiracy to monopolize in violation of § 2, a plaintiff must allege four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury. *Paladin Associates, Inc. v. Montana Power Co.,* 328 F.3d 1145, 1158 (9th Cir. 2003) (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224-225, (1947)). These elements are alleged in the FAC at ¶¶ 99-103 and in detail in the FAC at ¶¶ 46-67. Again, the roles of the individual defendants on the Pediatric Executive Committee, Medical Staff Executive Committee, and Hospital Board of Trustees are set forth in the FAC at ¶¶ 11-15.

### 3.   The FAC Adequately Alleges All State Law Claims

#### a.   The FAC Adequately Alleges a Claim For Retaliation In Violation of California Law

Dr. Fox alleges that the defendants and others engaged in an ongoing civil conspiracy to retaliate against him for advocacy on behalf of patients. (FAC ¶ 109)

Where two or more persons conspire to commit a wrongful act, they are all liable under California law. *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 784 (1979) ("[a]s long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damages on all of them, regardless of whether they actually commit the tort themselves."). The agreement need not be express but "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Id.*, at 785. Indeed, "Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator." Id. Furthermore, directors and officers of a corporation "may become liable if they directly ordered, authorized or participated in the tortious conduct." *Id*. This is precisely the situation as to Defendants here.

In his FAC, at ¶¶ 104-110, Dr. Fox has set forth a series of actions taken against him that he alleges were retaliation for his patient advocacy and the Defendants' participation in these actions. Whether these allegations are true or not is an issue for the trier of fact. Under the rule set forth in

---

*Wyatt*, all those medical staff officers, hospital officers, and hospital trustees found by the trier of fact to have participated, even tacitly, in the actions taken against Dr. Fox's privileges may be held liable if the trier of fact concludes that some or all of these actions were taken in retaliation for patient advocacy. As discussed above, the statute of limitations on this conduct does not even begin to run until the "last overt act" in the conspiracy. Thus, where, as here, the retaliatory actions are alleged to continue to the present, all such actions alleged as far back as 1992, when Dr. Fox complained about GSH's treatment of his wife as a patient (and as cited by Judge Whyte in the summary judgment order), may be considered by the trier of fact in assessing "the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." Under this rule, and where the Court "must accept all material allegations in the complaint as true and construe them in the light most favorable to" Dr. Fox, the claim cannot be dismissed as legally insufficient.

**b.    The FAC Adequately Alleges A Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing In Violation of California Law**

In the FAC, at ¶¶ 113-122, Dr. Fox alleges: (1) that Good Samaritan Hospital violated its agreements with Dr. Fox regarding his hospital privileges, (2) that in doing so the hospital violated its implied covenant of good faith and fair dealing with Dr. Fox, and (3) defendants Piché and Beaupre, as members of Good Samaritan's Board of Trustees, are liable as coconspirators with Good Samaritan Hospital on this basis.

**i.    Good Samaritan Hospital's Bylaws Are Contractual  Agreements**

At the outset it is necessary to clarify a point of confusion raised by Defendants as to whether "the bylaws" constitute a contract. They state that, "Moreover, the bylaws do not constitute a contract. See supra  note 9." Since there is no "note 9" in the memorandum, defendants were apparently referring to note 8. In note 8, Defendants correctly note that, while medical staff bylaws do not constitute a contract under California law, hospital bylaws were held to be contractual under *Janda*. (Def. Memo, 18:n.8, citing *Janda v. Madera Cmty. Hosp.*, 16 F. Supp. 2d 1181, 1188 (E.D. Cal. 1998). But then, after noting these differences, they proceed to the

---

1  contrary conclusion that "…the Medical Staff Bylaws and Hospital Bylaws cannot constitute a

2  contract…" This is simply not correct.

3       Hospital bylaws, required under 22 Cal. Admin. Code § 70701, are contractual, as

4  defendants acknowledge was held in *Janda*. *Id*.  (holding that the hospital's bylaws are contractual

5  because they "imposed additional duties on the medical staff and the Hospital that exceed the scope

6  of California's administrative requirements and constitute independent valid consideration for the

7  physician-hospital contract.").

8       Where there is a contract, there is also an implied term in that contract that both parties will

9  perform the contract in good faith.  *Foley v. Interactive Data Corp*., 47 Cal.3d 654, 683 (1988)

10  ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance

11  and its enforcement," citing the Rest.2d Contracts, § 205.)

12       In this case, Dr. Fox alleges that he had both express and implied-in-fact contracts with

13  Good Samaritan Hospital under its bylaws, supported by consideration.  FAC, at ¶¶ 115-117, 120.

14  Thus, under these contracts, both parties were obliged to perform in good faith.

15            **ii.  Breach of the Covenant of Good Faith and Fair Dealing**

16                **in the Hospital Bylaws Contract is Tortious.**

17       Under California law, breach of the covenant of good faith and fair dealing is generally an

18  action under contract but not under tort.  *Foley v. Interactive Data Corp*., 47 Cal.3d 654, 700

19  (1988) ("we hold that tort remedies are not available for breach of the implied covenant in an

20  employment contract to employees who allege they have been discharged in violation of the

21  covenant.").  However, there are exceptions.  The most often cited is that which applies to

22  bad-faith insurer claims.  *Id*., at 684 ("An exception to this general rule has developed in the

23  context of insurance contracts where, for a variety of policy reasons, courts have held that breach

24  of the implied covenant will provide the basis for an action in tort.").

25       The *Foley* court identified several interests that led it to adopt a tort cause of action in those

26  insurer cases, particularly the public interest served by enforcing the contract.  Id., at 683

27  ("Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort

28

law is primarily designed to vindicate "social policy."); Id., at 684-685 ("The insurers' obligations are ... rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements....[A]s a supplier of a public service rather than a manufactured product, the obligations of insurers go beyond meeting reasonable expectations of coverage.").  By contrast, employers are unlike insurers because they are not fiduciaries, they are not quasi-public, and they do not serve to spread losses across society.  Id., at 691 (noting that "employers do not owe similar fiduciary duties to employees…and…unlike insurance companies, employers are not 'quasi-public entities…[and] do not serve primarily, if at all, to spread losses across society.").

California courts have not addressed the issue of whether a breach of the covenant of good faith and fair dealing in the context of hospital bylaws is tortious.  However, hospital bylaws that deal with physicians' hospital privileges are affected with a public interest because hospitals are highly regulated quasi-public institutions with fiduciary responsibilities to both patients and staff and where patient welfare should be of primary concern.  *Ascherman v. Saint Francis Memorial Hospital,* 45 Cal.App.3d 507, 513 (1975) (noting that "if the proposition that any hospital occupies a fiduciary trust relationship between itself, its staff and the public it seeks to serve is accepted, then the rationale for any distinction between public 'quasi public' and truly private breaks down and becomes meaningless, especially if the hospital's patients are considered to be of primary concern.", citing *Silver v. Castle Memorial Hospital*,  53 Hawaii 563, 570 (1972)).

Where, as here, Good Samaritan's breach of its obligations of good faith and fair dealing under its bylaws harms not only Dr. Fox but also his patients, both current and future, it also harms all other members of Good Samaritan's medical staff by causing them to fear for their own privileges.  Finally, as seen in this case, such a breach can easily affect the ability of Dr. Fox and other members of the medical staff to advocate for patient care and patient rights since it undermines their security in being able to practice and make a living at Good Samaritan.  Thus, under the factors set forth in *Foley*, a hospital's breach of its obligations of good faith and fair

1  dealing are affected with a very large public and fiduciary interest and should therefore, as in the

2  insurer cases, be accorded a remedy in tort.

3                    **iii.    Defendants Piché and Beaupre Are Liable For the**
                           **Tortious Violations of Good Faith and Fair Dealing by**
4                           **Good Samaritan Hospital**

5      As set forth above and under the rule of *Wyatt*, officers and directors of a corporation may

6  be held personally liable for the acts of the corporation "if they directly ordered, authorized or

7  participated in the tortious conduct." *Wyatt*, supra, at 785.

8      Good Samaritan Hospital and its Board of Trustees had agreements with Dr. Fox that they

9  were obliged to perform in good faith. (FAC ¶¶ 115-117) They breached these agreements and

10  obligations. (FAC ¶¶ 118-119, 122) These breaches were tortious under the analysis of *Foley*.

11  Defendants Piché and Beaupre were and are members of Good Samaritan's Board of Trustees and

12  officers of Good Samaritan Hospital. (FAC ¶¶ 11-12) They authorized and participated in these

13  tortious acts. (FAC ¶ 122) Under *Wyatt*, they may be held personally liable for the tortious acts of

14  the corporation "if they directly ordered, authorized or participated in the tortious conduct." The

15  claim is properly pled and may not be dismissed.

16                **c.    The FAC Adequately Alleges a Claim For Tortious Interference**

17      Defendants claim that Dr. Fox's claim for interference with prospective economic relations

18  is insufficient in two respects: (1) that it fails to identify an independently wrongful act; and, (2)

19  that it fails to state with sufficient particularity the actual economic relationships disrupted.

20                        **i.    Independently Wrongful Acts**

21      California law requires the medical staff to comply with its adopted bylaws. *O'Byrne v.*

22  *Santa Monica-UCLA Medical Ctr.*, 94 Cal. App. 4th 797, 808 (2001) ("[s]ection…70703 of the

23  California Code of Regulations, title 22, required the…medical staff to adopt bylaws, and they

24  required the medical staff to abide by those bylaws.").

25      Dr. Fox has alleged that defendants repeatedly denied him medical staff privileges and

26  "deferred" them in contravention of Good Samaritan's medical staff bylaws during the period

27  2004-2008 (FAC ¶¶ 126-127) and also during the period before that from 1997-2004 (FAC ¶¶

28

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No. 08-CV-0198 RS

42-45).  Defendants did not abide by their own bylaws as required under California law.  The 1997-2004 period is relevant in this case because it encompasses the period of the ongoing civil conspiracy alleged in the FAC, at ¶ 127, the statute of limitations for which does not run until the "last overt act," taking it up to the present time.  (See, above.)  Thus, Dr. Fox has properly pled independently wrongful acts in support of his tortious interference claim, both before and after 2004.

### ii.    Actual Economic Relationships Disrupted

Defendants' other argument against Dr. Fox's tortious interference claim is as follows: "Plaintiff's claim also fails on the additional ground that he did not sufficiently allege facts demonstrating that he had an "economic relationship with a probability of future economic benefit" with his "Referral Sources." Rather, Plaintiffs allegations are limited to the fact that Defendants disrupted patient referrals from his Referral Sources."  (Def. Memo,  21:9-11)  (FAC ¶¶ 124 & 127)

Defendants cite *Fisher v. San Pedro Peninsula Hosp*., 214 Cal. App. 3d 590, 619-20 (1989) for the proposition that unless Dr. Fox can specifically identify, apparently by name, the potential patients interfered with by defendants' tortious conduct, patients who are not yet even in need of medical care, these patients are "hypothetical" or "speculative" and do not comprise the required "probability of future economic benefit."  However, *Fisher* does not actually stand for this proposition, and actually distinguishes its holding from such an interpretation.

In *Fisher*, a dentist and his nurse wife sued the wife's employer, a hospital on whose staff the husband also served, and one it its physician's, the wife's supervisor, for sexual harassment by the physician.  The dentist also brought a tortious interference claim against a second physician, a close associate of the first physician, for refusing to accept referrals of patients from the dentist. *Id.*, at 619-620.  The Court held that such a refusal did not rise to the level of disrupting the dentist's economic relations with his patients because the dentist could have referred those patients to other physicians and had failed to allege that he had lost any patients as a result of the alleged refusal to accept the dentist's referrals.  *Id.*, at 620 ("Having to seek other physicians or threats to

---

1  patient welfare are not the kind of *economic interest* which this tort was designed to protect.")

2  (emphasis in the original).  The *Fisher* court, however, then went on to distinguish such

3  non-interference from the exact claim made by Dr. Fox.  *Id.*, ("[n]or is this analogous to a situation

4  where a doctor is denied his right to pursue a profession by other competing doctors who conspire

5  to keep patients from the doctor.").  Thus, under defendants' own authority, a claim for tortious

6  interference will arise "where a doctor is denied his right to pursue a profession by other competing

7  doctors who conspire to keep patients from the doctor.").  This is Dr. Fox's allegation.  FAC ¶¶

8  123-128.  This is sufficient under *Fisher*.

9         Defendants' argument also fails for the reason that Dr. Fox did not allege that his economic

10  relations with future, unknown, patients were disrupted but, rather, that his actual business

11  relations with his present, named, referral sources were disrupted when those referral sources could

12  no longer refer pediatric ICU patients to him at Good Samaritan Hospital.  FAC ¶¶ 124-128.

13  These relationships were not "hypothetical" nor "speculative," but were real and actual.  Again, this

14  is sufficient under *Fisher's* test of whether "a doctor is denied his right to pursue a profession by

15  other competing doctors who conspire to keep patients from the doctor."  Dr. Fox's claim for

16  interference with prospective economic relations should not be dismissed.

17  **IV.    IF ANY PORTION OF THE FAC IS DEEMED DEFICIENT, LEAVE TO FILE AN
          AMENDED COMPLAINT SHOULD BE GRANTED**

18
         As shown above, the motion to dismiss should be denied in its entirety.  If the Court
19
   disagrees, however, Dr. Fox requests leave to amend the FAC to cure any infirmities.
20
         As a general matter, if a complaint is dismissed for failure to state a claim, leave to amend
21
   should be freely granted unless it is determined that no possible amendment would cure the
22
   complaint's deficiencies.  See,  *Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 296 (9th Cir. 1990),
23
   *cert. denied*, 502 U.S. 921 (1991).  A denial of leave to amend is reviewed for abuse of discretion,
24
   "'but such denial is 'strictly' reviewed in light of the strong policy permitting amendment.'"  *Moore*
25
   *v. Kayport Package Express, Inc.*, 885 F.2d 531, 537 (9th Cir. 1989) (citation omitted); see also
26
   *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 190 (9th Cir. 1987) (Ninth Circuit reversed
27
   district court's denial of plaintiff's motion for leave to file a fourth amended complaint).  Fed. R.
28

---

1    Civ. P. 15(a) provides that "leave shall be freely given when justice so requires."

2       In exercising that discretion, a district court must be guided by the underlying purpose of

3    Fed. R. Civ. P. 15, which is "to facilitate decision on the merits, rather than on the pleadings or

4    technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  Indeed, "Rule 15's

5    policy of favoring amendments to pleadings should be applied with 'extreme liberality.'" *Id.*;

6    *Rosenberg Bros. & Co. v. Arnold*, 283 F.2d 406 (9th Cir. 1960) (per curiam).

7    **V.    CONCLUSION**

8       For the foregoing reasons, Defendants' motion to dismiss under Rule 12(b)(6) should be

9    denied in its entirety, or if not, leave to amend should be granted as to any claim dismissed.

10

11    Dated: July 30, 2008            HENNEFER, FINLEY & WOOD

12

13

14          By _____/s/ James A. Hennefer_____

15               James A. Hennefer

16         Attorneys for Plaintiff Richard B. Fox, M.D.

17

18

19

20

21

22

23

24

25

26

27

28

---

*Fox v. Piché, et al.*    **MEMORANDUM IN OPP TO MOTION TO DISMISS**    Case No.  08-CV-0198  RS