1   James A. Hennefer (CSB# 059490)
            jhennefer@hennefer-wood.com
2   HENNEFER & WOOD
    425 California Street, 19th Floor
3   San Francisco, CA 94104-2296
    Telephone: (415) 421-6100
4   Facsimile:  (415) 421-1815

5   Attorneys for Plaintiff
    Richard B. Fox, M.D.

6

7

8

9                  IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                          SAN JOSE DIVISION

12

    Richard B. Fox, M.D.,                    )   No.  5:08CV01098 RS
13                                           )
                Plaintiff,                   )   **PLAINTIFF'S MEMORANDUM OF**
14                                           )   **POINTS AND AUTHORITIES IN**
        vs.                                  )   **OPPOSITION TO DEFENDANT MARK**
15                                           )   **S. McCONNELL M.D.'S MOTION TO**
    William Piché, Paul N. Beaupre, M.D., Arthur )   **DISMISS**
16  W. Douville, M.D., Mark S. McConnell,    )
    M.D., and Kenneth I. Tan, M.D.;          )   Date:    September 10, 2008
17                                           )   Time:  9:30 a.m.
                Defendants.                  )   Place:  Courtroom 4
18                                           )   Judge: Honorable Richard Seeborg
                                             )
19  _____     )

20

21

22

23

24

25

26

27

28

_____

*Fox v. Piché, et al.,* Case No. 5:2008CV01098 RS

MP&A, Plaintiff's Opposition to Defendant Mark S. McConnell's Motion To Dismiss

1

**TABLE OF CONTENTS**

2

3

TABLE OF AUTHORITIES                                                                iii

I.      PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.    ALLEGATIONS IN THE FAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        A.      Legal Standard Under Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        B.      The FAC Plausibly Alleges Dr. McConnell's Co-conspirator Liability

                Under the Sherman Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

                1.      The Antitrust Causes of Action Are All Based On New and

                        Independent Acts Arising Within the Statute of Limitations . . . . . . . . . . .  6

                2.      Dr. McConnell is Liable For the Antitrust Violations of Each

                        Co-Conspirator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        C.      Dr. Fox's State Law Causes of Action Are Not Time-Barred . . . . . . . . . . . . . .  12

                1.      California Law Tolls the Statute of Limitations on Civil

                        Conspiracies Until the "Last Overt Act" . . . . . . . . . . . . . . . . . . . . . . . .  12

                2.      Dr. McConnell Is Liable as a Co-Conspirator for the Sixth

                        and Eighth Causes of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

IV.     IF ANY PORTION OF THE FAC IS DEEMED DEFICIENT,

        LEAVE TO FILE AN AMENDED COMPLAINT SHOULD BE GRANTED . . . . . . .  14

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**CASES**                                                                      **PAGE(S)**

*Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184 (9th Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503 (1994) . . . . . . . . . . . . . . 13

*Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.*, 688 F.2d 689 (9th Cir.1982) . . . . . 7

*Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Columbia Steel Casting Co. v. Portland General Elec. Co.*, 111F.3d 1427 (9th Cir.1996) . 6, 7, 8

*DCD Programs Ltd. v. Leighton*, 833 F.2d 183 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Erickson v. Pardus,* 127 S.Ct. 2197 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Grisham v. Philip Morris U.S.A., Inc.,* 40 Cal.4th 623 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299 (9th Cir. 1986) . . . . . . . . . . . . . . 6, 7

*In re Corrugated Container Antitrust Litigation,* 661 F.2d 1145 (7th Cir., 1981) . . . . . . . . . . . 10

*In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68 (9th Cir. 1979) ("AMF") . . . . . . . . . . . . 7, 8

*Johnson v. Riverside Healthcare System, LP,* --- F.3d ----, 2008 WL 2875305 (9th Cir. 2008) . . 5

*Moore v. Kayport Package Express, Inc.,* 885 F.2d 531 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . 14

*Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir., 1987) . . . . . . . . . . . . . . 6, 7, 8

*Pinkerton v. U.S.*, 328 U.S. 640, 646-47 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Rambus Inc. v. Micron Technology, Inc.*, 2007 WL 1792310 (N.D.Cal. Jun 19, 2007) . . . . . . . . 7

*Reddy v. Litton Industries, Inc.*, 912 F.2d 291 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rosenberg Bros. & Co. v. Arnold*, 283 F.2d 406 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*U.S. v. Long,* 301 F.3d 1095, 1103 (9th Cir., 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*U.S. v. Webb*, 655 F.2d 977 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

25

26

27

28

1

## STATUTES

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 9

15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 9

15 U.S.C. § 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 11101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed.R.Civ.P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed.R.Civ.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 14

Fed.R.Civ.P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

22 Cal. Admin. Code § 70701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cal. Bus. & Prof. Code § 2056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cal. Code of Civ. Proc. § 339(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2    Plaintiff Richard B. Fox, M.D. ("Dr. Fox" or "Plaintiff") hereby submits this

3    memorandum of points and authorities in opposition to the motion of defendant Mark S.

     McConnell, M.D. ("Dr. McConnell"), to dismiss portions of the First Amended Complaint
4
     ("FAC") in this action, pursuant to Fed. R. Civ. P.Rule 12(b)(6).
5
     **I.  PROCEDURAL HISTORY**
6
            The summons' on the FAC for all defendants, including Dr. McConnell, issued on
7
     May 14, 2008.  (Docket Nos. 11-14)
8
            Defendants Piché, Beaupre, Douville and Tan accepted service through their counsel,
9
     Bingham McCutchen, and filed their motion to dismiss and their motion to strike on July 3,
10
     2008, noticing the hearing of these motions for August 20, 2008.  (Docket Nos. 42 and 43)
11
     These were orally argued on August 20, 2008, as noticed, and have been submitted to the Court
12
     for decision.
13
            Dr. McConnell accepted service of the summons and complaint through his personal
14
     counsel somewhat later and Bingham McCutchen filed Dr. McConnell's joinder in the other
15
     defendants' motion to dismiss and motion to strike on August 5, 2008, noticing the hearing of his
16
     joinder and motion to dismiss for September 10, 2008.  (Docket Nos. 51 and 53)
17
            As a result, the motion to dismiss and motion to strike of defendants Piché, Beaupre,
18
     Douville and Tan has already been heard and submitted to the Court for decision.  In so far as Dr.
19
     McConnell's motion to dismiss and motion to strike depend on the outcome of the motions of
20
     defendants Piché, Beaupre, Douville and Tan submitted on August 20, 2008, this memorandum
21
     of points and authorities does not address the issues raised and already briefed and submitted for
22
     decision on August 20, 2008.  It addresses only those limited issues raised separately in Dr.
23
     McConnell's motion to dismiss (Docket No. 51) which supplement those briefed, argued and
24
     submitted on August 20, 2008.
25

26

27

28

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    INTRODUCTION

"In for a penny, in for a pound," as the saying goes.  This is, of course, another way of stating the *Pinkerton* Rule that co-conspirators are liable for the reasonably foreseeable acts of their co-conspirators.  Dr. McConnell concedes that he sent a letter to Columbia/HCA's local chief, Thomas May, in December 1996 asking that May get rid of his competitor, Dr. Fox, from HCA's Good Samaritan Hospital ("GSH").  Shortly thereafter, GSH and its medical staff began a process to adopt a highly restrictive alternate coverage policy for pediatric ICU doctors, but not any other doctors, including adult ICU doctors.  From the adoption of this policy in 1999, through 2008, with a series of new rules and applications of the PICU alternate coverage policy, GSH and HCA were able to keep Dr. Fox from regaining his PICU privileges and ever competing with Dr. McConnell's group, the Northern California PICU Associates ("NorCal PICU").  The effect of the rules was to exclude Dr. Fox unless he joined Dr. McConnell's group. Then, in 1999, Dr. McConnell met with the other defendants to engineer a *de facto* exclusive pediatric ICU contract for himself and his group at GSH, an unlawful exclusive contract that Dr. McConnell supported and benefitted from through late 2004 and which other co-conspirators continue to actively enforce to this day.

Dr. McConnell argues that the action against him should be dismissed because, he claims, it fails to allege any specific wrongdoing on his part during the four-year statute of limitations period prior to the filing of this action.  However, even if there were no evidence of specific wrongdoing on his part through 2004 (which there is in the May 2004 "board prepared" rule allowing Dr. McConnell's NorCal PICU colleague Dr. Smyklo to qualify as alternate call – FAC ¶¶ 50-51), Dr. McConnell is still liable for the wrongful acts of his co-conspirators from 1999 through 2008 – wrongful acts which are alleged in detail in the FAC.

## III.    ALLEGATIONS IN THE FAC

Dr. Fox, is a well-credentialed, very highly skilled pediatric intensive care ("PIC") and pediatric pulmonology physician who has an impeccable record. Dr. Fox had full medical privileges at Good Samaritan Hospital ("GSH"), including all privileges required for him to

1  practice his board-certified specialties in the Pediatric Intensive Care Unit ("PIC Privileges"),[1]

2  until 1999 when the actions denying him privileges began. These actions have continued

3  unabated into 2008. Dr. Fox has never been able to regain his full privileges. FAC ¶ 1. GSH

4  changed the privilege categories and their requirements and they suspended, withheld, deferred

5  or denied various iterations of these privileges so that after 1999 Dr. Fox was never able to regain

6  the entire package of PICU Privileges necessary to render full PICU Services as before. (FAC

7  ¶ 3)

8         This action is against Dr. McConnell (a competitor of Dr. Fox who was a contract

9  physician for GSH) and also against his alleged co-conspirators: (a)William Piché ("Piché")(the

10  CEO of GSH); (b) Dr. Paul Beaupre ("Dr. Beaupre")(GSH's COO); (c) Dr. Arthur Douville

11  ("Dr. Douville")(the GSH Medical Staff Executive Committee chairperson and member); and (d)

12  Dr. Kenneth Tan ("Dr. Tan")(GSH's Pediatric Department Chair from 2004 to 2006 and a

13  partner in a neonatal intensive care services affiliate of Dr. McConnell's group.  (FAC ¶ 2)

14         This action was brought because these individual defendants in furtherance of a common

15  plan to exclude Dr. Fox from GSH, from 2004 through 2008, repeatedly acted to suspend,

16  withhold, defer and deny the "PIC Privileges" needed for Dr. Fox to provide "PIC Services" at

17  GSH.  Dr. Fox's exclusion from providing PIC Services at GSH has been based on arbitrary and

18  sham pretexts, was for retaliatory and anticompetitive purposes (at the request and for the benefit

19  of Dr. McConnell); in the self interests of defendants (including Dr. McConnell) and was for

20  reasons having nothing to do with legitimate considerations, such as Dr. Fox's qualifications,

21  skill or quality of patient care.  Each defendant took an active role in at least some of these

22  repeated illegal suspensions, withholding, deferrals and denials of Dr. Fox's privileges in the

23  period from 2004 through 2008.

24         Defendants, under California law, were charged with the authority to privilege doctors

25

26  _____

27  [1] "PICU Privileges" for Dr. Fox include Pediatric Critical Care without consultation, Pediatric
   Ventilator Management ("PVM"), and Pediatric Intensive Care ("PIC") – the package necessary for Dr.
   Fox to practice both of his board-certified specialties, Pediatric Critical Care and Pediatric Pulmonology

28  and to render full "PICU Services." FAC ¶ 3.

and entrusted to exercise independent judgment, through GSH's Medical Staff, for privileging

and the operation of GSH in the interest of patients and the community (22 California Admin.

Code § 70701 et seq.). Had they done so, they would have been immune from liability under

federal law.  (Health Care Quality Improvement Act ["HCQA"], 42 U.S.C. § 11101 et seq.)

Instead, they abused their public trust and neglected their legal duties to PICU patients, GSH

doctors, including Dr. Fox and the community. They did so in order to advance HCA's and their

own personal economic interests by excluding Dr. Fox from offering PICU Services at GSH and

giving all of that business to Dr. McConnell's group.  (FAC ¶ 4)

Defendants thereby damaged competition, PICU patients and Dr. Fox, through

unreasonable restraints of trade and monopolization of PICU Services at GSH. (Sherman Act,

Sections 1 and 2, 15 U.S.C. §§ 1 and 2, Claims I - V) Instead of basing their privileging on the

best interests of GSH and its patients and the qualifications of physicians, they retaliated against

Dr. Fox for advocating patient rights and HCA's compliance with the law, in violation of

California law (California Business & Professions Code § 2056, Claim VI), and interfered with

Dr. Fox's PICU business relations (Claim VIII).  (FAC ¶ 4)

HCA and its wholly-owned subsidiaries, Good Samaritan Hospital L.P., Samaritan

L.L.C., who collectively operated Good Samaritan Hospital,  and the GSH Medical Staff

organization are defendants in a previous and related action filed in this court by Dr. Fox ("2004

Action", case number 5:2004CV00874 RS) and named as co-conspirators of the defendants in

this action. GSH's for-profit owner, HCA, and its subsidiaries took over the previously non-

profit GSH in 1996. HCA immediately involved GSH itself in a nationwide Medicare fraud

scheme (for which HCA pled guilty to a criminal indictment in 2001) and in other illegal acts,

including EMTALA violations by transferring children out of their emergency room to an

affiliate the San Jose Medical Center (where Dr. McConnell took these patients) to spread the

patients among HCA hospitals. HCA secured the cooperation of the individual defendants herein,

through: (a)   direct employment of them (Piché, Beaupre); (b) appointment of them to GSH

positions (Piché, Beaupre, Douville); and (c) its contracts with them (McConnell, Tan). With

---

1  defendants' active participation, HCA and GSH were able to violate or avoid legal requirements

2  for "privileging" of Dr. Fox, retaliate against Dr. Fox for patient advocacy, and exclude Dr. Fox

3  from providing PICU Services at GSH. (FAC ¶¶ 5, 35-45).  The exclusion of Dr. Fox began with

4  the impetus of Dr. McConnell in 1996 (FAC ¶¶ 40- 42), continued with Dr. McConnell and his

5  NorCal PICU exclusionary contract in 1999 (FAC ¶¶ 15, 83) continued with the participation of

6  Dr. McConnell through May 2004 (FAC ¶ 51) and with Dr. McConnell's colleagues at NorCal

7  PICU and co-conspirators through 2008 (FAC ¶¶ 52-57).

8        Judge Whyte denied defendants' summary judgment motion in the 2004 Action.  He did

9  so in part base the inference of a conspiracy from Dr. McConnell's acts:

10

11            The facts from which Dr. Fox can argue an unlawful conspiracy can be
         inferred to include that: . . . (4) his suspension occurred after his outspoken
12       objection to transferring pediatric intensive care patients to [Dr. McConnell at] the
         [HCA] San Jose Medical Center [in violation of EMTALA]; (5) around the time of
13       his suspension the Hospital was negotiating with Dr. McConnell to have his group,
         a group that Dr. Fox felt could not provide adequate alternate call coverage,
14       provide PICU services at the Hospital; and (6) the Hospital failed to approve or
         timely approve privileges applications by physicians Dr. Fox designated for
15       alternate care coverage.

16  Case No. 5:04-CV-00874-RS, filed October 9, 2007, Docket No. 180, pages 9-11.

17        **IV.    ARGUMENT**

18        **A.    Legal Standard Under Rule 12(b)(6)**

19        A dismissal under Rule 12(b)(6) may be based on either a "lack of a

20  cognizable legal theory" or "the absence of sufficient facts alleged under a

21  cognizable legal theory." *Johnson v. Riverside Healthcare System, LP,* --- F.3d ----

22  , 2008 WL 2875305, at p. 3 (9th Cir. 2008).  Thus, the complaint need only provide

23  a "short and plain statement of the claim showing that the pleader  is entitled to

24  relief." Fed.R.Civ.P. 8(a)(2).  "Specific facts are not necessary; the statement need

25  only give the defendant[s] fair notice of what . . . the claim is and the grounds upon

26  which it rests." *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) (internal

27  quotation marks omitted). The complaint need only plead "enough facts to state a

28

---

1    claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 127 S.Ct.

2    1955, 1974 (2007). The complaint is viewed in the light most favorable to the non-

3    movant, "accepting all well-pleaded factual allegations as true, as well as any

4    reasonable inferences drawn from them. *Johnson, supra.*

5    **B.    The FAC Plausibly Alleges Dr. McConnell's Co-conspirator Liability**

6    **Under the Sherman Act.**

7    The First Amended Complaint ("FAC") alleges, as to Dr. McConnell, four (4)

8    Section 1 Sherman Act for conspiracy in restraint of trade under the Sherman Act and one

9    Section 2 Sherman Act cause of action for conspiracy to monopolize or attempt to

10   monopolize trade.  Defendant Dr. McConnell argues that the antitrust causes of action

11   must be dismissed as to him because those claims are all barred by the statute of

12   limitations or do not allege any acts on his part that occurred within the four years prior to

13   the filing of this action.  As discussed below, there were acts in violation of Sections 1 and

14   2within the four years prior to the filing of this action and Dr. McConnell is liable for

15   them both because he was: (1) a participant in 2004 acts; and (2) a co-conspirator under a

16   common plan from 1996 through 2008.

17   **1.    The Antitrust Causes of Action Are All Based On New and**

18   **Independent Acts Arising Within the Statute of Limitations**.

19   The statute of limitations under the Sherman Act for private actions under Section

20   4 of the Clayton Act is four years from the act causing the injury.  *Pace Industries, Inc. v.*

21   *Three Phoenix Co.,* 813 F.2d 234, 236 (9th Cir., 1987).  In antitrust law, "[a] continuing

22   violation is one in which the plaintiff's interests are repeatedly invaded and a cause of

23   action arises each time the plaintiff is injured." *Id.,*at 237 (citing *Hennegan v. Pacifico*

24   *Creative Service, Inc.*, 787 F.2d 1299, 1300-01 [9th Cir. 1986]).  When a continuing

25   violation exists, the limitations period runs from the "last overt act" by the defendant,

26   which must be (1) a new and independent act that is not merely a reaffirmation of a

27   previous decision that (2) inflicts "new and accumulating" injury on the plaintiff.  *Id.* at

28

238. "New and independent acts" may include active enforcement of policies first put into place outside the limitations period.

In *Columbia Steel Casting Co. v. Portland General Elec. Co.*, 111F.3d 1427 (9th Cir.1996), a power company refused to sell power to the plaintiff under an 18-year-old horizontal market share division agreement. The Ninth Circuit held that the refusal was a new and independent act because the original agreement "was not a permanent and final decision that controlled the later act." *Id.,* at 1444.

Similarly, in *Hennegan*, tour operators diverted customers from plaintiffs' souvenir shop. Although the tour operators had originally agreed to do so more than four years before plaintiffs filed suit, the Ninth Circuit held that the original agreement "did not immediately and permanently destroy the Hennegans' business, nor [was it] 'irrevocable, immutable, permanent and final.' " *Hennegan,* 787 F.2d at 1301. New and accumulating injury was inflicted upon the plaintiffs each time a defendant diverted customers from plaintiffs' business.  See also *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1190 (9th Cir.1984) (holding that active enforcement of an illegal tie is an independent act); *Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.*, 688 F.2d 689, 694 (9th Cir.1982) (holding that active enforcement of the terms of an illegal contract is a new and independent act); *Rambus Inc. v. Micron Technology, Inc.*, 2007 WL 1792310 (N.D.Cal. Jun 19, 2007) (NO. C-06-00244 RMW) (where defendant Rambus merely amended its earlier filed patent claims within the antitrust statute of limitations period, this was sufficient to restart the limitations period because "[a]ffirmative acts inflicting new injury will restart the statute of limitations, even when taken pursuant to an agreement or decision made prior to the limitations period," citing *Hennegan*, 787 F.2d at 1300-02.").

In contrast to *Columbia Steel* and *Hennegan*, the Ninth Circuit has found no continuing violation only in situations in which the act outside the limitations period "completely and permanently excluded [the plaintiff] from the market." *Hennegan*, 787 F.2d at 1301. In *AMF*, four automobile manufacturers collectively refused to buy

---

afterburners from the plaintiff outside the limitations period, deciding instead to

manufacture their own afterburners. *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68

(9th Cir. 1979) ("*AMF*").  The *AMF* court reasoned that because the defendants required

considerable lead time to integrate afterburners into new cars, the market for plaintiff's

new car afterburners "effectively disappeared" then and for the foreseeable future at the

point defendants decided to develop their own afterburners. Thus, the decision not to buy

from plaintiff was "irrevocable, immutable, permanent, and final." *AMF*, at 72.  Because

defendants' decision had the effect of permanently excluding plaintiff from the

manufacturers' afterburner market the court ruled in *AMF*, plaintiff's injury was complete

at that time, and it suffered no additional harm within the four-year limitations period.

Essentially, Dr. McConnell would construe *Pace Industries* as standing for the

proposition that, once an unlawful  conspiracy in restraint of trade is begun, all subsequent

acts pursuant to the conspiracy are merely reaffirmations of the original conspiracy that do

not restart the statute of limitations.  The effect then is that the statute of limitations runs

from the first overt act of the conspiracy, not the last.  It puts an ongoing conspiracy

beyond the reach of the law once the statute of limitations has run on the first act.  This

view is plainly counter to the result in *Columbia Steel* and *Wyatt*, discussed below.

Thus, defendants' reliance on *Pace Industries* is misplaced because that case is

limited to its facts and to a particular kind of allegation. In *Pace Industries*, the only

alleged antitrust violation was the defendants' prosecution of a lawsuit seeking to enforce

an assertedly illegal contract. The plaintiff argued that "each phase" of the lawsuit "from

the filing of [the] complaint through resolution of the final appeal constituted discrete

overt acts which restarted the statute of limitations." *Id.,* at 237. The Ninth Circuit rejected

this argument, holding that, "where the alleged antitrust violation is the attempted

enforcement of an illegal contract through judicial process, the initiation of judicial

proceedings is the last overt act for purposes of the statute of limitations."  *Id.*

---

*Fox v. Piché, et al.,* Case No. 5:2008CV01098 RS

MP&A, Plaintiff's Opposition to Defendant Mark S. McConnell's Motion To Dismiss

1    This case is more like *Columbia Steel* and *Hennegan* than *AMF* or *Pace*. Although

2    the general policy of Good Samaritan to require alternate call coverage by providers with

3    identical privileges had been in effect since 1999, this policy was not a "permanent and

4    final" decision that forever prevented Dr. Fox from obtaining PICU and PVM privileges.

5    Quite the contrary, Dr. Fox was legally entitled to apply for these privileges every two

6    years and to try to meet the shifting standards of the identical privileges policy and the

7    application of these standards.  Moreover, Dr. McConnell's co-conspirators could, and did,

8    between February 2004 and January 2008: (a) coerce Dr. Mendoza into withdrawing his

9    application to provide alternate coverage for Dr. Fox, (b) change, again, the pediatric ICU

10   privileging criteria to require applicants to be either "board certified or board prepared,"

11   where "board prepared" is a meaningless term fabricated by defendants and/or their

12   counsel to include Dr. McConnell's NorCal PICU colleague, (c) apply the more stringent

13   "board certified" requirement to exclude Dr. Fox's alternates while applying the

14   meaningless "board prepared" requirement to qualify their own NorCal PICU contracted

15   doctor who could not meet the "board certified" requirement, (d) allow their own

16   contracted pediatric ICU physicians to qualify based on claimed alternate call coverage by

17   physicians who did not live anywhere in Northern California, or in some cases, anywhere

18   else in California, and (e) allow co-conspirator Dr. Tan, who was neither "board certified

19   or board prepared," to be named as alternate call for the NorCal PICU member Dr. Silva.

20   (FAC ¶¶ 50- 54).  These acts cannot reasonably be styled as reaffirmations of the 1999

21   decision to adopt the "identical privileges" rule because they go far beyond that decision.

22   Thus, all of these comprised new and independent acts in the conspiracy sufficient to

23   restart the statute of limitations.

24

25   All of these tactics were used by the defendants to prevent Dr. Fox from competing

26   against Good Samaritan's contracted pediatric ICU group, Dr. McConnell and his

27   associates.  These tactics to divert business away from Dr. Fox were the equivalent of the

28   tactics used to divert business away from the Hennegans, tactics found to inflict a new

1  injury against the Hennegans each time a customer was thusly diverted.  Dr. Fox's injury

2  satisfies the requirement for a new and accumulating injury because pediatric ICU patients

3  were diverted to Dr. Fox's hospital-contracted competitors by defendants' various

4  exclusionary tactics during the limitations period.

5

6                  **2.    Dr. McConnell is Liable For the Antitrust Violations of Each**

7                         **Co-Conspirator.**

8          Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, makes it a criminal offense

9  to conspire in restraint of trade among the states.  15 U.S.C. § 1.[2]  Section two of the

10  Sherman Antitrust Act, 15 U.S.C. § 2, makes it a criminal offense to conspire to

11  monopolize trade among the states.  15 U.S.C. § 2.[3]  Section 4 of the Clayton Act, 15

12  U.S.C. § 15, provides a civil right of action for those injured in their business or property

13  by violations of the antitrust laws.[4]

14          Sections 1 and 2 of the Sherman Act apply to those persons who conspire to violate

15  their provisions, that is, co-conspirators.  The *Pinkerton* Rule makes a co-conspirator

16  equally liable for all reasonably foreseeable acts of any other co-conspirator.  *Pinkerton v.*

17  *U.S.,* 328 U.S. 640, 646-47 (1946) ("an overt act of one partner may be the act of all

18  without any new agreement specifically directed to that act."); *U.S. v. Long,* 301 F.3d

19

20  [2] 15 U.S.C. § 1, "Every contract, combination in the form of trust or otherwise, or conspiracy, in
    restraint of trade or commerce among the several States, or with foreign nations, is declared to be
21  illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby
    declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished
22  by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by
    imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."
23  [3] 15 U.S.C. § 2, "Every person who shall monopolize, or attempt to monopolize, or combine or
    conspire with any other person or persons, to monopolize any part of the trade or commerce among
24  the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction
    thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person,
25  $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion
    of the court."
26  [4] 15 U.S.C. § 15, "Except as provided in subsection (b) of this section, any person who shall be injured
    in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in
27  any district court of the United States in the district in which the defendant resides or is found or has
    an agent, without respect to the amount in controversy, and shall recover threefold the damages by him
28  sustained, and the cost of suit, including a reasonable attorney's fee."

1095, 1103 (9th Cir., 2002) ("[t]he *Pinkerton* doctrine is a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy.").

The *Pinkerton* rule is fully applicable in an antitrust case and holds a co-conspirator liable for all acts of all other co-conspirators until the last act in furtherance of the conspiracy or until the co-conspirator withdraws by an affirmative act designed to defeat the purpose of the conspiracy. *In re Corrugated Container Antitrust Litigation,* 661 F.2d 1145, 1151-1152 (7th Cir., 1981) ("[a]lthough the statutes of limitations have run for the antitrust charges, the plaintiffs admit that the federal statute of limitations for conspiracy does not begin to run until a defendant's last act in furtherance of the conspiracy. Unless an individual can show withdrawal from the conspiracy by an affirmative act designed to defeat the purpose of the conspiracy, that defendant remains liable for all acts committed by co-conspirators until the conclusion of the conspiracy.").

In the FAC, Dr. McConnell is alleged to be a part of a conspiracy to unlawfully restrain trade in interstate commerce by depriving Dr. Fox of his pediatric critical care privileges at Good Samaritan Hospital through any or all of: (1) exceeding self-regulatory authority under the Health Care Quality Improvement Act (¶¶ 77-81), (2) group boycott (¶¶ 82-88), (3) *de facto* exclusive contract (¶¶ 89-93), or (4) a scheme to retaliate against Dr. Fox for his patient advocacy (whistleblowing) (Fourth Cause of Action, (¶¶ 94-97). Indeed, Dr. McConnell is alleged to have been the initiator of the conspiracy when he wrote a letter in December, 1996, to HCA's Thomas May requesting that Mr. May eliminate Dr. Fox as a competitor of his.  FAC ¶ 40.  The efforts at Good Samaritan to restrict Dr. Fox's pediatric ICU privileges so as to force him to either join Dr. McConnell's group or be eliminated started right after Dr. McConnell's letter.  FAC ¶ 42.  This conspiracy was then carried out by members of the Pediatric Executive Committee, the Medical Staff Executive Committee, the Board of Trustees at Good Samaritan Hospital,

hospital administrators including co-defendants Piché and Beaupre, and hospital counsel, including overt acts as recently as January, 2008. FAC ¶¶ 26, 45-67.

The FAC plainly, prominently, and repeatedly alleges that Dr. McConnell was a co-conspirator in an ongoing conspiracy to restrain trade by eliminating Dr. Fox as Dr. McConnell's competitor. Under the *Pinkerton* Rule, Dr. McConnell is individually liable for the unlawful acts of his co-conspirators. Thus, even if he personally committed no wrongful act within the four year statute of limitations, he still has liability for the acts of his co-conspirators that occurred within that time period. All the overt acts since 2004, including the coercion of Dr. Mendoza, the PICU alternate coverage rule change in 2004, the disparate application of the rule from 2004 to the present, the deferral of Dr. Fox's privilege requests without a hearing as required under the Health Care Quality Improvement Act and under Good Samaritan's Medical Staff Bylaws, and the refusal to renew Dr. Fox's medical staff appointment because he refused to sign the HCA loyalty oath, are all chargeable to Dr. McConnell as a co-conspirator. His only defense is to establish that he withdrew from the conspiracy by some affirmative act designed to defeat the purpose of the conspiracy, a defense he cannot assert in a motion directed against the pleadings.

### C.    Dr. Fox's State Law Causes of Action Are Not Time-Barred.

Dr. McConnell also argues that Dr. Fox's two state law claims for retaliation (Sixth Claim for Relief), and interference with prospective economic relations (Eighth Claim for Relief) are time barred by California's two year statute of limitations under Cal. Code of Civ. Procedure § 339(1).

#### 1.    California Law Tolls the Statute of Limitations on Civil Conspiracies Until the "Last Overt Act."

The California Supreme Court has held that the statute of limitations in an ongoing civil conspiracy does not begin to run on any part of a plaintiff's claim until the "last overt act"

pursuant to the conspiracy has been completed. *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 786 (1979) ("when a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of a plaintiff's claims until the "last overt act" pursuant to the conspiracy has been completed."); unanimously reaffirmed in *Grisham v. Philip Morris U.S.A., Inc.,* 40 Cal.4th 623, 632 (2007) ("the statute of limitations does not begin to run until the last overt act pursuant to the conspiracy is completed," citing *Wyatt v. Union Mortgage Co.*).  In *Wyatt*, the Court noted that:

> "appellants stood accused of continuing their tortious conduct in furtherance of the conspiracy up until and even after the filing of the complaint. It was their own conduct that kept the cause of action against them alive. Therefore, no considerations of justice or equity require us to overrule the consistent line of cases that have applied the "last overt act" doctrine to civil conspiracies."

*Wyatt*, at 787.

In his Sixth and Eight Claims for Relief (retaliation and tortious interference), Dr. Fox alleges that these claims are the result of ongoing civil conspiracies among defendants and others.  FAC ¶¶ 109, 127.  Dr. Fox plainly alleges that there is ongoing conduct by some or all defendants pursuant to these conspiracies extending right up to the present time, four years after the filing of the 2004 Action against Good Samaritan Hospital and its medical staff.  FAC ¶ 67. It is "their own conduct that kept the cause of action against them alive." Thus, "no considerations of justice or equity" require this Court to apply a time bar to these claims.

Although these claims are pled as ongoing civil conspiracies, Dr. McConnell does not acknowledge this nor does he even cite or address the *Wyatt* and *Grisham* cases and why the "last overt act" doctrine does not toll the statute of limitations on these claims. Because Dr. Fox has properly pled ongoing civil conspiracies in support of the Sixth and Eighth Causes of Action, the "last overt act" doctrine tolls the statute of limitations on these claims to the present time. Thus, these claims are not time barred.

**2.    Dr. McConnell Is Liable as a Co-conspirator for the Sixth and Eighth Causes of Action**.

---

1   Under California law, co-conspirators to a tort are equally liable for the damages that
2   result from the conspiracy, whether they commit the tort themselves or merely concur in the
3   tortious scheme.  *Wyatt,* at 784 ("As long as two or more persons agree to perform a wrongful
4   act, the law places civil liability for the resulting damages on All of them, regardless of whether
5   they actually commit the tort themselves… The effect of charging . . . conspiratorial conduct is to
6   implicate all . . . who agree to the plan to commit the wrong as well as those who actually carry it
7   out… a plaintiff is entitled to damages from those defendants who concurred in the tortious
8   scheme with knowledge of its unlawful purpose.") (citations omitted); *Applied Equipment Corp.*
9   *v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 510-11 (1994) ("[c]onspiracy is…a legal doctrine that
10  imposes liability on persons who, although not actually committing a tort themselves, share with
11  the immediate tortfeasors a common plan or design in its perpetration.  By participation in a civil
12  conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators
13  within the ambit of the conspiracy," citing *Wyatt,* at 784).  Furthermore, "the requisite
14  concurrence and knowledge may be inferred from the nature of the acts done, the relation of the
15  parties, the interests of the alleged conspirators, and other circumstances…Tacit consent as well
16  as express approval will suffice to hold a person liable as a co-conspirator."  *Wyatt,*  at 785
17  (citations omitted).  'The elements of an action for civil conspiracy are the formation and
18  operation of the conspiracy and damage resulting to plaintiff from an act or acts done in
19  furtherance of the common design."  *Applied Equipment,* at 511.
20
21          Thus, where Dr. McConnell is alleged to have instigated the conspiracy with his letter to
22  HCA's Thomas May in 1996 and participated in it until at least late 2004, as a result of which Dr.
23  Fox was injured, Dr. McConnell is liable for all acts committed in furtherance of that conspiracy.
24  His motion to dismiss as to the Sixth and Eighth Causes of Action should be denied.
25
26  **IV.    IF ANY PORTION OF THE FAC IS DEEMED DEFICIENT, LEAVE TO FILE**
27  **AN AMENDED COMPLAINT SHOULD BE GRANTED**
28

---

1    As shown above, Dr. McConnell's motion to dismiss should be denied in its entirety.  If

2  the Court disagrees, however, Dr. Fox requests leave to amend the FAC to cure any infirmities.

3    As a general matter, if a complaint is dismissed for failure to state a claim, leave to

4  amend should be freely granted unless it is determined that no possible amendment would cure

5  the complaint's deficiencies.  See*, Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 296 (9th Cir.

6  1990), *cert. denied*, 502 U.S. 921 (1991).  A denial of leave to amend is reviewed for abuse of

7  discretion, "'but such denial is 'strictly' reviewed in light of the strong policy permitting

8  amendment.'" *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 537 (9th Cir. 1989)

9  (citation omitted); see also *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 190 (9th Cir. 1987)

10  (Ninth Circuit reversed district court's denial of plaintiff's motion for leave to file a fourth

11  amended complaint).  Fed. R. Civ. P. 15(a) provides that "leave shall be freely given when

12  justice so requires."

13    In exercising that discretion, a district court must be guided by the underlying purpose of

14  Fed. R. Civ. P. 15, which is "to facilitate decision on the merits, rather than on the pleadings or

15  technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  Indeed, "Rule 15's

16  policy of favoring amendments to pleadings should be applied with 'extreme liberality.'" *Id.*;

17  *Rosenberg Bros. & Co. v. Arnold*, 283 F.2d 406 (9th Cir. 1960) (per curiam).

18

19

20  **V.    CONCLUSION**

21    For the foregoing reasons, Dr. McConnell's motion to dismiss under Rule 12(b)(6) should

22  be denied in its entirety, or if not, leave to amend should be granted as to any claim dismissed.

23

24  Dated: August 20, 2008              HENNEFER, FINLEY & WOOD

25

26                          By _____/s/ James A. Hennefer_____

27                              James A. Hennefer

28                          Attorneys for Plaintiff Richard B. Fox, M.D.

---

*Fox v. Piché, et al.,* Case No. 5:2008CV01098 RS

MP&A, Plaintiff's Opposition to Defendant Mark S. McConnell's Motion To Dismiss

-15-