**\*E-FILED 9/22/08\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RICHARD B. FOX, M.D., | NO. C 08-1098 RS |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND TO STRIKE** |
| v. | |
| WILLIAM PICHE, et al., | |
| Defendants. | |

## I. INTRODUCTION

Defendants William Piche, Paul N. Beaupre, Arthur W. Douville, and Kenneth I. Tan[1] (collectively "defendants"), move to dismiss and to strike portions of plaintiff Richard B. Fox's first amended complaint ("FAC") in this antitrust action pursuant to Rules 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure. Fox opposes the motions. For the reasons explained below, defendants' motions to dismiss and to strike will be granted in part and denied in part.

## II. BACKGROUND

On March 18, 2008, Fox filed his FAC against these defendants for claims related to those he

---

[1] Defendant Dr. Mark McConnell joins the motion to strike in its entirety. He also joins in the motion to dismiss, and advances additional arguments for dismissal of the first through sixth and eighth claims for relief.

1

1  previously instituted against Good Samaritan Hospital in 2004.[2] The FAC advances eight claims.[3]
2  As set forth in the FAC, Fox is a pediatrician with a specialty in the care of critically ill children who
3  require mechanical ventilation. Prior to 1999, Fox practiced at GSH. In that year, GSH adopted a
4  rule requiring any physician seeking practice privileges at the hospital to designate two physicians
5  with identical privileges to serve as backups in the event of the first physician's unavailability. Prior
6  to that time, GSH had required only that physician-designated backups possess "appropriate"
7  privileges.

Fox recounts that he declined to designate backup physicians with the privileges required by
GSH. He claims, as a result, that defendants denied the pediatric intensive care ("PIC") privileges
needed for him to provide PIC services at GSH beginning first in 1999, and then at renewal intervals
including from 2004 through 2008,[4] thereby requiring him to relocate his practice to a nearby
hospital.

In conjunction with each of those privilege denials, Fox alleges that defendants: (1) changed
the rules to exclude his backup physicians; (2) retaliated against him in 2006 after he refused to sign
a non-negotiable HCA, Inc. ("HCA")[5] corporate loyalty oath that he contends required him to put
HCA's profits ahead of his patients' interests; (3) terminated his privileges by refusing to send him
his reappointment letter; (4) interfered with business relations between Fox and his referral sources

---

[2] Good Samaritan Hospital LP and Good Samaritan Hospital LLC (jointly "GSH") are for-profit organizations which provide health care services such as pediatric care to individuals in the San Jose, California community.

[3] The eight claims are: (1) unreasonable restraint of trade - exceeding self-regulation authority - in violation of Sherman Act § 1; (2) rule of reason group boycott in violation of Sherman Act § 1; (3) *de facto* exclusive dealing contract in violation of Sherman Act § 1; (4) unreasonable restraint of trade - retaliation - in violation of Sherman Act § 1 and Cal. Bus. & Prof. Code § 2056; (5) monopolization and attempt to monopolize in violation of Sherman Act § 2; (6) retaliation - withholding of hospital privileges in violation of public policy under Cal. Bus. & Prof. Code § 2056; (7) breach of contract and implied covenant of good faith and fair dealing; and (8) interference with prospective economic relations.

[4] PIC is provided in a pediatric intensive care unit ("PICU"). A PICU has highly skilled doctors, and advanced life support technology. These are deployed to treat children with life-threatening conditions.

[5] HCA is a holding company with affiliates including GSH. GSH was a non-profit hospital until HCA took over in 1996.

1  when those sources could no longer refer PIC patients to him at GSH; (5) further disrupted the
2  relationship between Fox and his referral sources by withholding and deferring his PICU privileges;
3  and (6) disregarded GSH's own hospital and medical staff bylaws with regard to "privileging"
4  procedures.  In this action, Fox contends that the rule change was part of an anti-competitive scheme
5  designed to gain the benefits of Fox's practice and to favor a competing group of physicians with
6  whom defendants had a relationship.  This led Fox to begin a long-running legal battle against GSH,
7  and the individual medical professionals now named in the FAC.

8         The individual defendants, except Dr. McConnell, are all either on GSH's board of trustees
9  ("BOT")[6] or are members of relevant hospital committees.[7]  Dr. McConnell was under contract to
10 provide PICU services for HCA at GSH and at HCA's San Jose Medical Center until that latter
11 facility closed.  He founded Northern California PICU Associates ("NorCal PICU"), and employed
12 other PICU physicians at GSH.  HCA awarded a contract to NorCal PICU for coverage of PICU
13 patients at GSH and referral of all PICU patients at GSH in 1999.

14        Fox alleges that Piche, Beaupre, the BOT, MSEC, and PEC conspired together to prompt his
15 suspension occurring shortly after: (1) he spoke out against transferring PICU patients to the HCA
16 San Jose Medical Center; and (2) GSH entered into an agreement with Dr. McConnell to have
17 NorCal PICU group provide PICU services at GSH.  Fox further alleges that this conspiracy affected
18 interstate commerce because he received patients and payment for his services, and physicians
19 received authorization from the respective committees to practice pediatrics, treat patients, and
20 receive payment for their services from sources outside as well as inside California.

21       Fox also alleges that PICU services represent a separate product market from other medical
22 services because the children who are in need of them are not able to obtain substitutes from other
23 medical providers, and their pediatric physicians and parents do not price-shop PICU services or

---

[6]  The BOT controls GSH physician privileges.

[7]  The relevant committees are the medical staff executive committee ("MSEC") and the pediatric executive committee ("PEC").  The MSEC makes final recommendations to the BOT for all privileging rules and actions.  The PEC is the executive body of the pediatrics department.  It makes initial recommendations to the MSEC on all privileging rules and actions involving members of the pediatrics department, including Fox's privileges.

3

switch PICU providers based on price. Fox further identifies GSH, with its unique PICU program, as a separate geographic market because children born at GSH use that facilities' PICU services exclusively. As a result, these children constitute an economic "aftermarket," according to Fox, from which they can exit only at significant switching cost. Finally, defendants have the power to control prices and to exclude competition in these PICU markets, it is alleged, because it is difficult for them to obtain the necessary pediatric certification and privileges from GSH.

### III.  LEGAL STANDARD

#### A.  Anti-Trust Claims

The Ninth Circuit, interpreting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007), has applied a heightened pleading standard for antitrust claims. *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 970-71 (9th Cir. 2008); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 n.5 (9th Cir. 2008). As the Ninth Circuit has held, at least in the antitrust context, *Twombly* "retired" the familiar standard from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), interpreting Rule 8 of the Federal Rules of Civil Procedure, which provided that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Rick-Mik Enters., Inc.*, 532 F.3d at 970-71 (citing *Twombly*, 127 S. Ct. at 1968); *see Kendall*, 518 F.3d at 1047 n.5 ("At least for the purposes of adequate pleading in anti-trust cases, the Court specifically abrogated the usual 'notice pleading' rule . . . ."). Owing to the often increased complexity and expense of discovery and pre-trial litigation in antitrust matters, the Supreme Court reasoned that more must be shown before the action should be allowed to proceed than simply the traditional Rule 8 notice pleading. *Twombly*, 127 S. Ct. at 1966-67.

While Rule 8 requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in antitrust matters, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Rick-Mik Enters., Inc.*, 532 F.3d at 970 (quoting *Twombly*, 127 S. Ct. at 1965). A plaintiff must do more than provide labels, conclusions, and a formulaic recitation of a claim's elements in the anti-trust context. *Id.* (citing *Twombly*, 127 S. Ct. at 1964-65). A claim under the Sherman Act, in particular, requires that a complaint provide enough factual matter to

1 suggest that an agreement was made. *Id*. (citing *Twombly*, 127 S. Ct. at 1965).

B.     Remaining Claims

For Fox's remaining claims, the traditional pleading standard under Rule 8 remains applicable. A complaint may be dismissed as a matter of law pursuant to Rule 12(b)(6) for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). For purposes of a motion to dismiss, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the non-moving party. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

"A complaint should not be dismissed unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994). The court, however, "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Id.* at 754-55. A court does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974. A court's review is limited to the face of the complaint, documents the complaint references, and matters of which the court may take judicial notice. *Anderson v. Clow (In re Stac Elecs. Sec. Litig.)*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

Motions to dismiss generally are viewed with disfavor and are to be granted rarely. *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Leave to amend must be granted unless it is clear that amendments cannot cure the complaint's deficiencies. *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995). Nevertheless, when amendment would be futile, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

C.     Motion to Strike

The Court may strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike generally will not be granted unless it is clear that the matter to be stricken could not have any possible bearing on the subject matter of the litigation. *LeDuc v. Ky. Cent. Life Ins. Co.*, 814 F. Supp. 820, 830 (N.D. Cal. 1992). Allegations

"supplying background or historical material or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant." *Id*.  Moreover, allegations that contribute to a full understanding of the complaint as a whole need not be stricken. *Id*.

## IV. DISCUSSION

A.  Statute of Limitations

   1.  Antitrust Claims

Defendants aver that each of Fox's antitrust claims (claims one through five) are time barred. Any claim under the Sherman Act is barred unless commenced within four years after a defendant commits an act that injures a plaintiff. *Zenith Radio Corp. v Hazeltine Research*, 401 U.S. 321, 338 (1971).

> [I]n antitrust [a claim] accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act.  A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a [claim] arises each time the plaintiff is injured.  However, even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.

*Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (citations omitted). "However, 'not every act by an antitrust defendant is sufficient to restart the statute of limitations.'" *Id*. (quoting *Aurora Enters., Inc. v. Nat'l Broad. Co., Inc.*, 688 F.2d 689, 694 (9th Cir. 1982)).  That is, separate violations within the statute of limitations period that are not controlled by the previous act or decision and which inflict new injury will restart the statute of limitations. *Id*. at 238.  An overt act will restart the statute of limitations if: (1) it is a new and independent act that is not merely a reaffirmation of a previous act; and (2) it inflicts new and accumulating injury on a plaintiff. *Id*.

Fox filed this suit against defendants on March 18, 2008, so any claim that accrued before March 18, 2004, would otherwise be time-barred unless a new injury intervened.  Defendants contend that Fox's alleged injuries would have been caused when GSH adopted the initial identical privilege rule in April 1999 and subsequently suspended Fox's PICU privileges for failing to comply with that rule in June 1999.  According to defendants, Fox's claims are therefore time barred because Fox's injury was complete in 1999, and the subsequent denials operated simply to reaffirm the first denial.  Fox maintains, in response, that he was entitled to apply for privileges on a two-year cycle

and that each new denial of privileges constitutes an actionable event.

"'New and independent' acts may include active enforcement of policies first put into place outside the limitations period." *Red Lion Medical Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1223 (E.D. Cal. 1999). In *Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444 (9th Cir. 1996), for example, the Ninth Circuit held that defendant's refusal to sell power to plaintiff pursuant to an eighteen-year-old market share agreement was a new and independent act because the original agreement was not a permanent and final decision that controlled subsequent events.

By contrast, where the act outside the limitations period operates to exclude a plaintiff from the market completely and permanently, subsequent acts within the period do not operate to restart the clock. *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986). For instance, in *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 70 (9th Cir. 1979), automobile manufacturers decided to manufacture their own afterburners instead of buying them from plaintiff. When that decision was made, plaintiff's afterburner market disappeared because the manufacturers needed a large amount of time to integrate their new afterburners into their cars. *Id.* at 71. The manufacturers' decision was "irrevocable, immutable, permanent, and final," because it permanently excluded plaintiff from the afterburner market. *Id.* at 72. At that time, plaintiff's injury was complete. *Id.*

Here, Fox was entitled to apply for new privileges every two years and was then subject to a new adverse decision denying those privileges in response. Fox advances this as a continuing conspiracy characterized by new and independent acts occurring within the 2004 to 2008 period.[8] The facts as alleged by Fox align more closely to those in *Columbia Steel* than in *Multidistrict* to the extent that each application and ensuing denial operated as a separate process even if the result seemed predictable in light of past experience. Each denial inflicted new and accumulating injury on Fox in that the denial was not immutable or automatic. Fox had to refile an application for benefits, and each time his request had to go through a new process, with new paperwork, and a

---

[8] Fox supports these allegations in the FAC ¶¶ 3, 45-46, 61-76, 85.

7

separate resulting decision.

Moreover, the process itself purported to be open and subject to change. As Fox alleges, between April 2004 and January 2008, GSH modified the criteria for satisfying the identical privileges rule by, for example, instituting the requirement that PICU privilege applicants be either board certified or board prepared in pediatric critical care medicine.

It is similarly worthy of note that the previous presiding judge in a related action denied summary judgment based on a similar statute of limitations argument, finding an issue of material fact as to whether defendants committed new and independent acts within the four years before Fox filed. *Fox v. Good Samaritan Hosp.*, No. C-04-00874 RMW, 2007 WL 2938175, at *13 (N.D. Cal. Oct. 9, 2007). While not bound by that decision here, it is instructive and persuasive. In short, because Fox has alleged new and independent acts which, if proven, would restart the antitrust statute of limitations, defendants' motion, on that basis and at this stage of the proceedings, will be denied.

2.  State Law Claims

Defendants also contend that California's two year statute of limitations under Cal. Civ. Proc. Code § 339(1) bars each of Fox's state law claims (claims six, seven, and eight).[9] An action for wrongful denial of hospital privileges falls within Section 339(1)'s two year period. *Edwards v. Fresno Cmty. Hosp.*, 38 Cal.App.3d 702, 704 (1974). However, "when a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of the plaintiff's claims until the 'last overt act' pursuant to the conspiracy has been completed." *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 786 (1979). Fox alleges that his sixth and eighth claims for relief are

---

[9] Section 339(1) states that within every two years:

> An action upon a contract, obligation or liability not founded upon an instrument of writing, except as provided in Section 2725 of the Commercial Code or subdivision 2 of Section 337 of this code; or an action founded upon a contract, obligation or liability, evidenced by a certificate, or abstract or guaranty of title of real property, or by a policy of title insurance; provided, that the cause of action upon a contract, obligation or liability evidenced by a certificate, or abstract or guaranty of title of real property or policy of title insurance shall not be deemed to have accrued until the discovery of the loss or damage suffered by the aggrieved party thereunder.

Cal. Civ. Proc. Code § 339(1).

8

1  the result of ongoing civil conspiracies among defendants. FAC ¶¶ 109, 127. Fox maintains that the
2  individual defendants, acting through their respective committees, conspired to: (1) exclude him
3  from practice at GSH by suspending and withholding his PICU privileges for advocating on behalf
4  of his patients' rights; and (2) disrupt his relationships with his referral sources and the patients they
5  would refer. Fox goes on to allege that this ongoing conspiracy on the part of defendants extends up
6  to the present date. At the pleading stage, Fox satisfies his obligation to identify overt acts
7  extending into the applicable limitations period.

B.   Sherman Act: Claims One Through Four

Fox's first four claims for relief against all defendants are for unreasonable restraint of trade in violation of Sherman Act § 1. To establish a Sherman Act § 1 claim, Fox must show: (1) a contract, combination, or conspiracy; (2) the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) the restraint affected interstate commerce. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001). "The phrase 'contract, combination, or conspiracy' limits application of the Sherman Act [§ 1] to concerted conduct by more than one person or single entity." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1449 (9th Cir. 1988). "Unilateral conduct by a single entity does not implicate Sherman Act § 1 regardless of the magnitude of the restraint on competition; only section two covers unilateral conduct." *Id.* at 1449-50. "[O]fficers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). Defendants assert that Fox cannot maintain his Sherman Act § 1 claims because he does not adequately allege: (1) a contract, combination, or conspiracy; and (2) that the alleged restraint affected interstate commerce.

Almost ten pages of Fox's FAC are devoted to detailing facts in support of an alleged ongoing conspiracy. From paragraphs thirty-five to sixty-seven Fox identifies conduct engaged in by defendants through their membership on the BOT, MSEC, and PEC from 1996 through 2003 and 2004 through 2008 to support his Sherman Act claims. For example, Fox alleges facts relating to a conspiracy when his suspension occurred shortly after he spoke out against transferring PIC patients to the HCA San Jose Medical Center, and GSH's negotiation with Dr. McConnell to have his group,

9

1  one Fox contends could not provide adequate alternate call coverage, provide PICU services at GSH.
2  FAC ¶¶ 40-41.  Construing the FAC in the light most favorable to Fox as required, his pleading
3  sufficiently raises issues of fact as to whether GSH and defendants conspired to exclude Fox from
4  offering PICU care at GSH.
5        Fox also alleges facts reflecting that his claims implicate interstate commerce.  Specifically,
6  Fox alleges that he receives patients and payment for his services from sources outside California.
7  *Id.* ¶ 8.  Fox contends that the PEC, MSEC, and BOT determine which doctors are credentialed to
8  practice pediatrics at GSH.  The doctors who have been so credentialed allegedly treat patients and
9  receive payment for their services from sources also from outside the state.  *Id.* ¶ 9.  For purposes of
10 a motion to dismiss, therefore, Fox has adequately set forth the requisite impact on interstate
11 commerce and claims one through four cannot be deemed deficient as a matter of law on that basis.
12 C.    <u>Claim Five: Monopolization and Attempt to Monopolize</u>
13       Fox's fifth claim for relief against all defendants alleges monopolization and attempt to
14 monopolize in violation of Sherman Act § 2.  That provision makes it unlawful to "monopolize, or
15 attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any
16 part of the trade or commerce among the several States . . . ."  15 U.S.C. § 2.  A claim for
17 monopolization under Sherman Act § 2 has two elements: (1) the possession of monopoly power in
18 the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished
19 from growth or development as a consequence of a superior product, business acumen, or historic
20 accident.  *Verison Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).
21 A civil claim requires the further showing of causal injury.  *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848,
22 855 (9th Cir. 1995).  Defendants argue that Fox's fifth claim should be dismissed because Fox has
23 not alleged adequately defendants' monopoly power in the relevant market.
24       To survive a motion to dismiss under Sherman Act § 2 Fox must delineate a relevant market
25 and show that defendants restrained trade in that market.  *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404,
26 1413 (9th Cir. 1991).  For the purpose of assessing monopolization or an attempted monopolization
27 claim, "relevant market" is defined as a pool of services that are reasonably interchangeable and are
28 therefore economic substitutes for one another.  *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,

10

65 F. Supp. 2d 1052, 1058 (N.D. Cal. 1998). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (9th Cir. 1997).

In the instant case, Fox adequately pleads a relevant market for the purpose of assessing his monopolization or his attempted monopolization claim. As noted above, Fox first contends that GSH, with its unique PICU program, is a separate geographic market because children born at GSH, where they receive pediatric care from Fox and other physicians, use that facilities' PICU services exclusively. As a result, according to Fox, these children constitute an economic "aftermarket," from which they can exit only at significant switching cost. In line with his contention, and as also noted above, Fox further argues that PICU services represent a separate product market from other medical services because the children who are in need of PICU services are not able to substitute services from other providers, and their pediatric physicians and parents do not price-shop PICU services or switch PICU providers based on price.

Fox next contends that defendants have the power to control prices and to exclude competition in these PICU markets because it is difficult for physicians, such as Fox, to obtain the necessary pediatric certification and privileges from GSH. Fox goes on to point out that Piche's, Beaupre's, Douville's, and Tan's roles on the PEC, MSEC, and BOT control the relevant market. Fox claims, for instance, that the PEC members such as Tan, acting at the request of Dr. McConnell's NorCal PICU group, made a change in the PICU privilege rule to exclude Fox and his alternate coverage physicians, while allowing them to include their own contracted PICU physicians. Fox goes on to explain that approving such a rule change was facilitated through Tan's role as PEC chairman and as a member of the MSEC. This alleged scheme was then approved by the MSEC and BOT on which Piche, Beaupre, and Douville served as members.

As for Dr. McConnell, as explained above, Fox's claim also passes muster because he alleges that McConnell, as NorCal PICU's owner, is the only defendant who provides PICU services at

11

GSH, and that PICU services present a separate product market. FAC ¶¶ 2, 15, 29. Despite defendants' arguments to the contrary, Fox adequately pleads the requisite market power under his monopolization claim based on defendants' roles on their respective committees or as chief of a medical service provider.

D.     Claim Six: Withholding of Hospital Privileges in Violation of Public Policy

Fox's sixth claim for relief against all defendants is for retaliation - withholding of hospital privileges in violation of public policy under Cal. Bus. & Prof. Code § 2056. That section protects physicians against retaliation after advocating for medically appropriate health care for their patients. Nothing in Section 2056 requires that a physician actually be prevented from providing medically appropriate health care, but rather, the plaintiff must reasonably believe that defendants' acts impaired or damaged his ability to treat his patients. *In re Ponoma Valley Med. Group, Inc.*, 476 F.3d 665, 674 (9th Cir. 2007).

Defendants argue that Fox fails to allege the requisite retaliation by each defendant for such patient advocacy. The FAC, however, does contain the necessary nexus between the acts of the defendants, through their committee service and otherwise, and the alleged acts of retaliation. Underlying all of Fox's retaliatory claim averments is the assertion that defendants, through their committee service, arbitrarily adopted the identical coverage requirements and engineered the referral of his patients to Dr. McConnell and his NorCal PICU group. Fox further avers other retaliatory acts by incorporation, such as when he declined to sign the HCA corporate loyalty oath, which he characterizes as requiring him to put HCA's profits ahead of those of his patients. Doing so, according to Fox, interfered with his duty to advocate on behalf of his patients. Fox goes on specifically to link each defendant, except Dr. McConnell, to an ongoing civil conspiracy to retaliate against him for advocacy on behalf of his patients. FAC ¶ 109. Fox's statements must be broadly construed. *Pomona*, 476 F.3d at 674. By pleading retaliatory conduct linked to specific defendants, Fox has sufficiently pled a claim for violation of Section 2056 under the liberal notice pleading standards for all defendants except Dr. McConnell. Fox will be given leave to amend, if he can do so, to link alleged retaliatory conduct by Dr. McConnell and the NorCal PICU with the ongoing conspiracy alleged in FAC ¶ 109. In all other respects, the motion to dismiss the sixth claim is

12

denied.

E.     <u>Claim Seven: Breach of Contract and Implied Covenant of Good Faith and Fair Dealing</u>

Fox's seventh claim for relief names Piche and Beaupre only, and advances the theory of breach of contract and implied covenant of good faith and fair dealing under California common law. At oral argument, counsel for Fox acknowledged that at a minimum he should have pled the breach of contract and the implied covenant of good faith and fair dealing claims separately. He further suggested that an analysis of that claim in two separate parts would be appropriate in assessing the viability of the seventh claim for purposes of this motion.

    1.     <u>Hospital Bylaws</u>

Defendants first argue that the medical staff bylaws and hospital bylaws cannot constitute a contract. Fox now acknowledges that the only contract at issue is the hospital bylaws, and that therefore its eligibility to operate as a contract is a precondition to the viability of the seventh claim for relief. There is a paucity of case authority directed to that question, with only one federal court construing California law to interpret hospital bylaws as a contract when it imposed additional duties on the medical staff and the hospital that exceeded the scope of California's administrative requirements; constituting independent valid consideration. *Janda v. Madera Cmty. Hosp.*, 16 F. Supp. 2d 1181, 1186-88 (E.D. Cal. 1998).

While the issue of whether hospital bylaws constitute a valid contract in California has not been definitively determined, at this stage Fox advances a sufficient basis on which to build a contract claim. Likewise, in *Ennix v. Stanten*, No. C 07-02486 WHA, 2007 WL 2462119, at *8 (N.D. Cal. Aug. 28, 2007), defendants contended that plaintiff never had a contract with the hospital. The court, nonetheless, determined that the question of whether the medical staff bylaws constituted a contract did not need to be resolved at the pleading stage, where it was sufficient that plaintiff made a plausible claim that he had a contractual relationship with the hospital.[10] *Id*. Adopting the reasoning from *Ennix* in this case, deciding whether or not the hospital bylaws constitute a contract

---

[10]     In *Ennix v. Stanten*, 556 F. Supp. 2d 1073, 1084 (N.D. Cal. 2008), at summary judgment, the court held that there was a genuine dispute of material fact as to whether or not a contractual relationship existed.

13

1 need not be resolved at this point in the litigation as Fox advances a plausible claim that the hospital
2 bylaws created such a contractual relationship.

        2.        <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Even assuming the existence of a contract, Piche and Beaupre argue that Fox may not pursue a breach of the implied covenant under a tort theory. In California, in every contract there is an implied covenant of good faith and fair dealing. *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 91 (1995). That covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. *Id*. California courts have recognized this covenant in a wide variety of contracts. *Id*. In *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654 (1958), and *Crisci v. Sec. Ins. Co.*, 66 Cal.2d 425 (1967), the California Supreme Court held that if an insurance carrier breaches the covenant of good faith and fair dealing it may give rise to a cause of action in tort as well as in contract. *Freeman*, 11 Cal.4th at 91. While the law implies a covenant of good faith and fair dealing in all contracts, whether the covenant always gives rise to an action in tort is not clear. *Id*. While the California Supreme Court has held that a tort action is available for breach of the covenant in an insurance contract, the court emphasized "the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility." *Id*. However, "[w]hen we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters." *Id*.

The principle that contract law exists to enforce legally binding agreements between parties while tort law is designed to vindicate social policy, *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 514 (1994), dooms Fox's claim. The insurance policy cases beginning with *Freeman* represent "a major departure from traditional principles of contract law[,]" *Cates Constr., Inc. v. Talbot Partners*, 21 Cal.4th 28, 46 (1999), and the California courts that have considered this issue in a variety of settings have unanimously refused to extend tort remedies outside the insurance arena. *Id*. at 46 n.9. Significantly, no court appears to have extended a tort remedy to breaches allegedly engaged in by individual officers of a hospital. Indeed, Fox identifies no legal precedent even in the insurance context where individual officers were found liable for tortious breach. This

14

1 Court, therefore, is unwilling to recognize a new tort action under California law absent guidance
2 from the California legislature or courts. Accordingly, Fox's claim for breach of the implied
3 covenant of fair dealing against Piche and Beaupre is dismissed with prejudice.

4       3.    <u>Breach of Contract</u>

5 "A cause of action for damages for breach of contract is comprised of the following
6 elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's
7 breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil &*
8 *Gas Co.*, 116 Cal.App.4th 1375, 1391 n.6 (2004). Assuming the existence of a contract, Fox still
9 fails to allege such a specific undertaking between Piche, Beaupre, and himself. Instead, as Fox
10 states in his opposition, he alleges that he had express and implied-in-fact contracts with GSH. As a
11 result, Piche and Beaupre contend that they cannot be held personally liable for GSH's contracts
12 because they were at most acting as GSH's agents.

13     Generally, an agent does not become personally liable for the principal's nonperformance.
14 Restatement (Second) of Agency § 328. Fox responds by stating that GSH violated its agreements
15 with him regarding his hospital privileges and that Piche and Beaupre, as members of GSH's BOT,
16 are liable as co-conspirators with GSH. Fox cites *Wyatt*, 24 Cal.3d at 785, for the proposition that in
17 California, directors and officers of a corporation "may become liable if they directly ordered,
18 authorized or participated in the tortious conduct." "Personal liability, if otherwise justified, may
19 rest upon a 'conspiracy' among the officers and directors to injure third parties through the
20 corporation." *Id*. Fox's proposition is misplaced here because he may not proceed with his breach of
21 contract claim under a tort theory for the same reasons described above. Fox's entire breach of
22 contract claim is predicated on an underlying tort. As such, he does not adequately plead a breach of
23 contract claim in California. While the claim is therefore deficient as it now stands, Fox will be
24 given leave to amend to plead facts, if he can do so in good faith, regarding how Piche and Beaupre,
25 as corporate officers, are liable for an alleged breach of contract between GSH and Fox.
26 Accordingly, the motion to dismiss is granted with leave to amend.

27 F.    <u>Claim Eight: Interference with Prospective Economic Relations</u>
28     Fox's eighth claim for relief against all defendants is for interference with prospective

economic relations under California common law.  In California, the tort of intentional interference with prospective economic relations requires: (1) an economic relationship between plaintiff and a third party, with the probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship; (3) intentional acts on the part of defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to plaintiff proximately caused by defendant's acts.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003).

Defendants first maintain that Fox has not pled sufficient facts demonstrating an economic relationship with a probability of future economic benefit.  In *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 619-20 (1989), plaintiff doctor's cause of action for intentional interference with prospective economic advantage against defendant doctor failed where the action was based on defendant's refusal to examine plaintiff's patients.  Although plaintiff alleged that defendant actually disrupted the relationship by forcing plaintiff to seek out other physicians, thereby threatening the welfare of plaintiff's patients, there was no allegation that plaintiff actually lost patients.  *Id*. at 620.  "Having to seek other physicians or threats to patient welfare [were] not the kind of *economic interest* which this tort was designed to protect."  *Id*.

To distinguish *Fisher*, Fox argues that he does not allege disruption of economic relations with future, unknown, patients, but rather, that his actual business relations with his present, named, referral sources were disrupted when those sources could no longer refer PICU patients to him at GSH.  FAC ¶¶ 124-28.  In so contending, Fox omits to identify those referral sources or the actual patients not referred.  In *Janda*, just as in this case, the substance of plaintiff's allegations was that defendant's interference impaired his economic relationships with his *existing* patients.  16 F. Supp. 2d at 1189.  Defendants there argued that plaintiff needed to identify those existing patients specifically.  *Id*.  The court stated that pleading interference with existing patients, even if not subject to proof, survived a motion to dismiss because the substantive law of California does not require more.  *Id*.  While Fox's disrupted referral source relationships are arguably different than the disrupted existing patients in *Janda*, Fox's claim similarly survives here because Fox's sources are restricted to current referral sources rather than future unknown sources.

Defendants next contend that Fox fails to allege sufficient facts in support of the third

16

element of the tort, namely that: "[A] plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.'" *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 375, 392-93 (1995) (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 (Or. 1978)).  "[A]fter *Della Penna* the elements of the tort of interference with prospective economic advantage remain the same, except that the third element also requires a plaintiff to plead intentional *wrongful* acts on the part of the defendant designed to disrupt the relationship." *Korea Supply Co.*, 29 Cal.4th at 1154.  "It is insufficient to allege the defendant engaged in tortious conduct distinct from or only tangentially related to the conduct constituting the actual interference." *LiMandri v. Judkins*, 52 Cal.App.4th 326, 342 (1997).

Fox argues that defendants did not abide by GSH's own bylaws, as required under California law, when defendants repeatedly denied him medical staff privileges and "deferred" them.  In the FAC, Fox avers:

> Defendants, acting with and through other participants in their unlawful acts, intentionally and unlawfully disrupted the relationship between Dr. Fox and his referral sources by the following independently unlawful acts: (a) repeated and unlawful "withholding" and "deferral" of Dr. Fox's PICU privileges, continuing from 2004 to the present; (b) interference with [another doctor's] application for PVM privileges; (c) adoption of the sham "board prepared" requirement in 2004; (d) denial of PICU privileges for lack of call coverage in 2006, despite the naming of the required NorCal PICU group as coverage, (e) termination of all medical staff privileges by constructively denying reappointment in 2006-2008.

FAC ¶ 126.  The allegations in that paragraph contain the necessary pleading of independent wrongful acts.  Accordingly, the motion to dismiss the eighth claim for relief is denied.

G.   <u>Motion to Strike</u>

Defendants move to strike paragraphs 5, 34-38, 40, 42, 45, 83-85, 105-07, 114-22, and 126. Defendants seek to strike those paragraphs which include allegations: (1) that pertain to non-party HCA's unlawful business practices (paragraphs 5, 34-36, 38); (2) that fall outside the relevant statute of limitations (paragraphs 37, 40, 42, 44, 45, 83-85, 105-07, 126); (3) that deal with Fox's seventh claim for relief for breach of the implied covenant of good faith and fair dealing on the grounds that it duplicates Fox's breach of contract claim (paragraphs 114-22); and (4) that pertain to Fox's request for damages in the seventh claim for relief to the extent it seeks to recover damages for emotional

17

distress and loss of reputation based on Fox's breach of contract claim (paragraph 122).

Defendants first argue that paragraphs 5, 34-36, and 38 pertain to non-party HCA's unlawful business practices and are irrelevant and unfairly prejudicial. In that they are correct. These paragraphs are immaterial in their entirety to the claims for relief Fox brings against these defendants. The motion to strike these paragraphs is therefore granted.

Defendants next argue that the Court should strike paragraphs 114-22 dealing with Fox's seventh claim for relief. Because the portion of claim seven regarding the tort based breach of the implied covenant of good faith and fair dealing was dismissed with prejudice, the motion is granted. If Fox chooses to replead a breach of contract claim, he may again introduce any facts relevant to that underlying claim.

Finally, based on the disposition above, defendants' motion to strike the paragraphs that fall outside the relevant statute of limitations (paragraphs 37, 40, 42, 44, 45, 83-85, 105-07, 126) is denied. Accordingly, the motion to strike is granted in part and denied in part.

## V.  CONCLUSION

Defendants' motions to dismiss and to strike are granted in part and denied in part as follows:

(1) The motion to dismiss is denied as to claims one through five and claim eight.

(2) Claim six is dismissed as to Dr. McConnell with leave to amend as provided above.

(3) The portion of the seventh claim regarding breach of the implied covenant of good faith and fair dealing is dismissed with prejudice.

(4) The portion of the seventh claim regarding breach of contract is dismissed with leave to amend.

(5) The motion to strike paragraphs 5, 34-36, and 38 is granted.

(6) The motion to strike paragraphs 114-22 is granted as set forth above.

(7) The motion to strike paragraphs 37, 40, 42, 44, 45, 83-85, 105-07, and 126 is denied.

IT IS SO ORDERED.

Dated: September 22, 2008

RICHARD SEEBORG
United States Magistrate Judge